[Cite as *Owens v. Owens*, 2022-Ohio-3450.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| JASON P. OWENS, | : | APPEAL NO. C-210488 |
| | | TRIAL NO. DR-2000165 |
| Plaintiff-Appellant, | : | |
| | | |
| vs. | : | *O P I N I O N.* |
| | | |
| JACQUELINE OWENS, | : | |
| | | |
| Defendant-Appellee. | : | |


Appeal From:  Hamilton County Court of Common Pleas, Domestic Releations
               Division

Judgment Appealed From Is:  Affirmed in Part and Reversed in Part, and Cause
                            Remanded

Date of Judgment Entry on Appeal:  September 30, 2022


*Daryle C. Tibbs*, for Plaintiff-Appellant,

*Cathy R. Cook*, for Defendant-Appellee.

**ZAYAS, Presiding Judge.**

{¶1} Plaintiff-appellant Jason Owens ("husband") appeals from the divorce decree entered by the Hamilton County Court of Common Pleas, Domestic Relations Division. In the divorce decree, the trial court terminated husband's marriage with defendant-appellee Jacqueline Owens ("wife"), designated wife the sole residential parent and legal custodian of the parties' children, granted husband parenting time, ordered that husband pay child support, rendered a division of property, and awarded wife attorney fees. Husband now challenges the trial court's judgment in four assignments of error. For the reasons that follow, we affirm the judgment of the trial court in part, reverse the judgment of the trial court in part, and remand the cause for further proceedings consistent with this opinion and the law.

## I. Factual and Procedural History

{¶2} Husband and wife met in Philadelphia and moved to Ohio together in 2009. They purchased a home together in 2011 and were married on July 12, 2012. At the time of the marriage, husband held an Equiniti account which contained stock from The Proctor and Gamble Company ("P&G"). The parties had their first child in 2015 and their second child in 2018. Issues arose during the marriage related to husband's sexual addiction issues and infidelity with prostitutes, as well as wife's use of pain medication and other mental-health related issues. Husband started seeing a therapist, and wife engaged in mental-health treatment. The parties also engaged in couple's counseling.

{¶3} Ultimately, husband filed for divorce on January 28, 2020. In May of 2020, the parties' oldest child, L.O., made comments to wife that created a concern of sexual abuse by husband. Wife took L.O. to the emergency room, where she was told to follow up with the Mayerson Clinic. L.O. was interviewed by the Mayerson clinic

and wife was told that the Mayerson Clinic would be following up with the Hamilton County Department of Job and Family Services ("HCJFS"). L.O. was interviewed by an assessment worker from HCJFS. Wife ultimately learned that the allegations were not going to be pursued by the authorities.

{¶4} On June 18, 2020, agreed temporary orders were entered that husband was to have no contact with the children until further order of the court, and husband was to have exclusive occupancy of the marital residence. On August 18, 2020, another agreed order was entered providing husband with two hours per week of supervised visitation. Husband filed a motion for additional parenting time on March 17, 2021, which was granted by the trial court on May 12, 2021. Under the parenting-time order, husband was to have parenting time with the children on Saturdays from noon until Sunday at 6:00 p.m., supervised at the home of paternal grandmother, and Wednesdays from 1:00 p.m. to 7:00 p.m., supervised by "Aunt Kathy" or "Meagan." The order provided that, once the children were ready for bed, husband was to say goodnight, return to and sleep at his own residence, and not return until the morning. The order also provided that the Wednesday parenting time would be conducted in a public place. This schedule was to continue for a period of eight weeks, and then, beginning on July 17, 2021, husband was to have parenting time on alternating Fridays at 5:00 p.m. until Sunday evening at 6:00 p.m., supervised by paternal grandmother at her home, and Wednesdays from 1:00 p.m. to 7:00 p.m., supervised by "Aunt Kathy" or "Meagan." The requirement for husband to sleep at his own residence was to remain in place under the new schedule, but the Wednesday visit was no longer required to be in a public place. The order further provided, "All parenting time supervision shall be conducted as follows: only the Supervisor shall help the girls

bathe, go to the bathroom, dressing [sic], etc., and the Supervisor shall make sure the children are not alone with Father at any time."

{¶5} On June 15, 2021, husband filed a "proposed allocation of parental rights and responsibilities," which proposed shared parenting. Hearings were held on August 10, August 11, August 12, and August 27, 2021. The evidence presented at trial included testimony from husband, wife, husband's therapist, wife's nurse practitioner from Lee Side Wellness, the parties' couple's counselor, the assessment worker from HCJFS, a social worker and forensic interviewer from the Mayerson Clinic, L.O.'s therapist, paternal grandmother, two individuals who each completed an appraisal of the marital home, wife's attorney, and the guardian ad litem. Two experts in psychology also testified at the hearing, Dr. Taylor and Dr. Bassman.

{¶6} Dr. Taylor testified that he completed an assessment with husband and concluded that husband did not display any form of sexual thoughts, behaviors, beliefs, or attitudes that would be consistent with other males who have been involved in sexual abuse of a child. When asked if, within a reasonable degree of scientific certainty, husband was a risk or danger to his daughter, he answered, "No, he's not."

{¶7} Dr. Bassman testified that, in situations where there have been allegations which have not been substantiated, he strongly suggests that a safety plan be developed. He described a safety plan as the precautions that someone would take to ensure the safety of the child. He said that L.O. making these statements was a cry for help, understanding, and compassion. He explained that husband and wife should help L.O. understand that certain precautions are in place in the relationship. He clarified that creating a safety plan did not mean that someone was acknowledging that they did sexually offend. He said, "It's just meaning that you love the person

4

enough, that you're compassionate enough to make some changes in your life, that you're really so devoted to your children that you'll go through this process."

{¶8} Dr. Bassman's report recommended that husband engage in individual psychotherapy to assist with understanding and addressing the dynamics of his intimacy issues, to assist in understanding the dynamics of his daughter making the allegations of sexual abuse, and to acquire resources that would help him, including developing a prevention and safety plan to ensure his daughter's safety. He advised that it would be helpful to have a third-party professional, other than husband's therapist, evaluate husband's progress in this regard. He also advised that more than one session per month of psychotherapy would be needed for this to be accomplished.

{¶9} The trial court entered a "final order" regarding all issues on September 2, 2021, and entered a decree of divorce on September 16, 2021. The trial court awarded sole residential and legal custody of the children to wife and ordered that husband was to have parenting time on the first, second, and fourth Saturday of the month beginning at 11 a.m. until 5 p.m., and Wednesdays after school until 6 p.m. The trial court also ordered that (1) husband's parenting time need not be supervised, except that naps–if required–should be supervised by paternal grandmother at her house, (2) holidays should be according to the court's standard parenting order, but no overnights or extended time shall occur, (3) husband must have another adult available during his parenting time to take the children to the restroom if necessary and is not do so himself, and (4) the children should be encouraged to speak on the telephone to husband or wife on the other's parenting time and, if either child requests such contact, the means shall be provided to them with no discouragement. The court additionally stated:

A 'safety plan' needs to be developed to allow the minor child to feel safe as recommended by Dr. Bassman, including but not limited to total honesty in his dealings with the child and her mother, making sure the child is aware that only honesty is acceptable and that she will be heard no matter what she has to say, and to incorporate compassion in his dealings with the child and her mother. Father should follow the recommendations of Dr. Bassman (including participating in psychotherapy for more than one session per month with a psychologist who has been provided with a copy of Dr. Bassman's report, not a sex therapist). Once he has done so, Father may file a motion to lift the restrictions of his parenting time and/or increase parenting time.

**{¶10}** The trial court further ordered that husband pay child support, effective June 1, 2020. Regarding the division of property, in relevant part, the trial court found that all shares of the Equiniti stock should be allocated as marital and found that any equity in the parties' home was marital. Finally, the trial court ordered that husband pay wife $15,000 in attorney fees. Husband timely appealed and now raises four assignments of error for our review.

### III. Law and Analysis

*A. First Assignment of Error - Division of Assets*

**{¶11}** In his first assignment of error, husband argues that the trial court erred in its valuation and division of marital property. Specifically, he challenges the trial court's orders related to the marital home and the Equiniti stock. In a divorce proceeding, the trial court must "determine what constitutes marital property and what constitutes separate property" and divide the marital property and separate property equitably between the spouses in accordance with R.C. 3105.171. R.C.

6

3105.171(B). "Generally, this means that the court should award each spouse his or her separate property and then distribute the marital estate equally, unless an equal division would be inequitable." *Boolchand v. Boolchand*, 1st Dist. Hamilton Nos. C-200111 and C-200120, 2020-Ohio-6951, ¶ 5, citing R.C. 3105.171(B)-(D). If an equal division would be inequitable, the court "shall divide it between the spouses in the manner the court determines equitable." R.C. 3105.171(C)(1).

{¶12} Marital property does not include separate property. R.C. 3105.171 (A)(3)(b). Separate property includes "[a]ny real or personal property or interest in real or personal property that was acquired by one spouse prior to the date of the marriage." R.C. 3105.171(A)(6)(a)(ii). "The commingling of separate property with other property of any type does not destroy the identity of the separate property as separate property, except when the separate property is not traceable." R.C. 3105.171(A)(6)(b). Thus, "[a]s long as it is traceable, separate property retains its identity, even when it is commingled with marital property." *Boolchand* at ¶ 8, citing R.C. 3105.171(A)(6)(b), and *Peck v. Peck*, 96 Ohio App.3d 731, 734, 645 N.E.2d 1300 (12th Dist.1994). "The party in a divorce action claiming that specific property owned when the marriage terminates is not marital but separate has the burden of proof by a preponderance-of-the-evidence standard." *Id.*, citing *Dunn v. Dunn*, 1st Dist. Hamilton Nos. C-010282 and C-010292, 2002-Ohio-6247, ¶ 14.

{¶13} In making a division of marital property, the court must consider all relevant factors, including the factors set forth in R.C. 3105.171(F). R.C. 3105.171(C)(1). The court may issue any orders that it determines equitable. R.C. 3105.171(J). In any order for the division of property, "the court shall make written findings of fact that support the determination that the marital property has been equitably divided and shall specify the dates it used in determining the meaning

7

'during the marriage.' " R.C. 3105.171(G). "During the marriage" means either the period of time from the date of the marriage through the date of the final hearing, or, if the court determines that the use of either or both of those date would be inequitable, the period of time between the dates selected and specified by the court as equitable. R.C. 3105.171(A)(2).

{¶14} "This court reviews 'the manner in which a domestic-relations court executes an equitable division of property for an abuse of discretion.' " *Boolchand*, 1st Dist. Hamilton Nos. C-200111 and C-200120, 2020-Ohio-6951, at ¶ 9, citing *McKenna v. McKenna*, 1st Dist. Hamilton No. C-180475, 2019-Ohio-3807, ¶ 9. "An abuse of discretion is more than a mere error of judgment; it implies that the court's attitude was arbitrary, unreasonable, or unconscionable." (Citations omitted.) *Id.* "Factual issues, however, such as those arising in the classification and valuation of property, are reviewed under the distinct sufficiency-and-manifest-weight-of-the-evidence standards." *Id.*, citing *McKenna* at ¶ 9-10.

### A1. Marital Home

{¶15} Husband first argues that the trial court failed to award him his premarital equity in the marital home. The trial court ordered that husband was to retain the marital home and found the marital equity in the home to be $230,000, minus a loan from paternal grandmother of $10,000 and minus the mortgage as of April 2020. The marital home was purchased, and refinanced, prior to the marriage. Both loans listed husband as the sole borrower, and husband testified that only his name was on the deed. However, the holding of title by one spouse "does not determine whether the property is marital property or separate property." R.C. 3105.171(H).

**{¶16}** The parties were living together at the time of purchase and wife testified that they agreed to purchase the home. Wife also testified that money from the parties' joint checking account, where both of their paychecks were deposited, was used to purchase the home. Wife submitted as evidence a letter, dated November 27, 2009, where she gave authorization for husband to use funds from their joint checking account when purchasing the home. While husband testified that the money used at closing was money loaned to him from his mother and grandmother, the testimony from his mother was that she loaned husband $10,000. The "cash from borrower" presented at the time of purchase was $13,324.11. Thus, the money from his mother and grandmother would not have covered the full cash amount used at closing.

**{¶17}** Wife further testified that she assisted with completing the necessary renovations to the home under the first loan. Husband agreed in his testimony that wife assisted with the renovations. Wife submitted evidence of a carpet receipt, dated May 30, 2010, that said the carpet was sold to, "Owens & Griffith, Jason Jackie." Wife additionally testified that she used settlement money that she received in October 2010 to pay the parties' Home Depot credit card bill, which she asserted was accumulated by the parties while completing the renovations. Even further, wife testified that the mortgage payments were made from the parties' joint checking account and submitted evidence showing that the mortgage was paid from their joint checking account in 2010, 2011, and 2012, all prior to the marriage. Therefore, the trial court's determination that any premarital equity in the home should be attributed to both parties was supported by sufficient evidence and was not against the manifest weight of the evidence. *See Kotch v. Kotch*, 178 Ohio App.3d 358, 2008-Ohio-5084, 897 N.E.2d 1191, ¶ 22-24 (5th Dist.). Accordingly, this portion of the assignment of error is overruled.

**{¶18}** Husband next argues that the trial court erred in valuing the marital home based on a second home appraisal completed by wife in July 2021 rather than on the first home appraisal completed by both parties in May 2020. "Prior to dividing a couples' property and debts, the trial court must determine the duration of the marriage by pinpointing the time period that will be considered 'during the marriage.' " *Elliot-Thomas v. Lewis*, 9th Dist. Summit No. 29164, 2019-Ohio-3870, ¶ 5, citing *Tustin v. Tustin*, 9th Dist. Summit No. 27164, 2015-Ohio-3454, ¶ 17. "The term 'during the marriage' is a term of art and is the period that is used to identify separate and marital property and debts and to value the couples' property and debt." *Id.* The trial court must specify the dates it used in determining the meaning of "during the marriage." R.C. 3105.171(G).

**{¶19}** " 'As a general matter, a trial court should consistently apply the same set of dates when evaluating marital property that is subject to division and distribution in a divorce proceeding.' " *Kachmar v. Kachmar*, 7th Dist. Mahoning No. 08 MA 90, 2010-Ohio-1311, ¶ 47, citing *Angles v. Angles*, 5th Dist. Fairfield No. 00CA1, 2000 Ohio App. LEXIS 4281, *12 (Sept. 15, 2000). "If the circumstances of a given case so require, the trial court may choose different dates for valuation purposes so long as the court adequately explains its reasons, and its decision does not constitute an abuse of discretion." *Id.*, citing *Angles*. "However, the trial court abuses its discretion when it chooses a division date that occurs after the end of the marriage." (Citation omitted.) *Id.* "This is so because '[t]he duration of the marriage is critical in distinguishing marital, separate, and post-separation assets and determining appropriate dates for valuation." *Id.*, citing *Harris v. Harris*, 11th Dist. Ashtabula No. 2002-A-81, 2003-Ohio-5350, ¶ 10.

**{¶20}** "Trial courts often terminate marriages as of the date of the final hearing." *Harris* at ¶ 10, citing R.C. 3105.171(G); *see* R.C. 3105.171(A)(2)(a). "Nevertheless, the Ohio Supreme Court has stated that equity may occasionally require the trial court to choose a de facto termination of marriage date." *Id.*, citing *Barish v. Barish*, 69 Ohio St.2d 318, 319, 432 N.E.2d 183 (1982); *see* R.C. 3105.171(A)(2)(b). "Generally, trial courts use a de facto termination of marriage date when the parties separate, make no attempt at reconciliation, continually maintain separate residences, separate business activities and/or separate bank accounts." *Id.* at ¶ 11, citing *Gullia v. Gullia*, 93 Ohio App.3d 653, 666, 639 N.E.2d 822 (8th Dist.1994).

**{¶21}** Two home appraisals were completed on the marital home. The first appraisal was completed by both parties in May 2020 and valued the marital home at $177,000. The second appraisal was done by wife in July 2021 and valued the marital home at $230,000. Testimony introduced at trial established that the difference in values was attributable to an increase in the market conditions between the time of the first appraisal and the time of the second appraisal.

**{¶22}** The trial court determined that the parties separated on January 16, 2020, and stated, "That date is an appropriate termination point for the marriage due to a separation in all aspects of the marriage." Yet, the trial court used the valuation for the marital residence that occurred in July 2021. While no evidence was presented of the value of the residence as of January 16, 2020, the first appraisal completed by both parties in May 2020 was substantially closer to the marriage termination date than the appraisal done by wife in July 2021. Thus, the first appraisal was more representative of the value of the home at the time of termination, particularly where the evidence showed that there was an unprecedented substantial increase in the

11

housing market between the marriage termination date and the date of valuation for the second appraisal.

{¶23} Further, while the trial court explained that the current market condition was the attributing factor for the difference in values, it did not explain why utilizing the second appraisal value would result in a more equitable distribution of the parties' property. *See Angles*, 5th Dist. Fairfield No. 00CA1, 2000 Ohio App. LEXIS 4281, at *13-14. Therefore, we hold that the trial court abused its discretion in utilizing a valuation date well beyond the date it determined to be the last date "during the marriage" when there was an available valuation done much closer in time to the date of termination that better represents the value of the home as of the termination of the marriage. *See Kramer v. Kramer*, 10th Dist. Franklin No. 18AP-933, 2019-Ohio-4865, ¶ 34-39. Accordingly, we sustain this portion of the assignment of error.

### A2. Equiniti Stock

{¶24} Husband argues that the trial court erred in determining that there was insufficient tracing evidence to award him his premarital shares of the Equiniti stock. The trial court found that the parties had an Equiniti P&G stock account, which husband opened prior to the marriage, that voluntary contributions were made to the account during the marriage, and that husband failed to sufficiently trace his premarital shares as his separate property. Accordingly, the trial court ordered that the 346.251 shares in the account as of the last date of the marriage be equally divided, resulting in an award of 173.12 shares to wife.

{¶25} Husband explained in his testimony that the Equiniti account was a dividend reinvestment account. He said, "So every time there's a dividend, it automatically gets reinvested into the company." He submitted evidence showing the share balance summaries for the Equiniti account at the relevant points in time and

12

the transactions that occurred within the account. This evidence showed that husband had 293.502 shares of P&G stock as of July 23, 2012. Husband testified that he purchased some of these shares growing up, but a lot were received as gifts from his family. No plan distributions or any other transaction occurred in the account between the date of the marriage, July 12, 2012, and July 23, 2012, the date of the first share balance summary in the record. The number of shares in the account remained the same as of August 13, 2012. However, on August 14, 2012, the share balance decreased to 199.976 shares. The list of transactions reflects that 93.526 shares were sold on August 14, 2012. After this sale, no additional sale of shares occurred during the marriage. The voluntary contributions to the account began on August 24, 2012, after the date of the parties' marriage and after the sale of shares occurred, and continued over the duration of the marriage. Both parties agreed that all voluntary contributions were made during the marriage. As of January 1, 2020, the share balance in the account had increased to 346.251.

{¶26} From this evidence, we know that the shares that were sold were sold from husband's premarital shares, and we know that the remaining 199.676 shares after the sale were husband's remaining premarital shares. No evidence was presented to indicate that these shares did not remain in the account as of the last date that the trial court considered to be during the marriage, January 16, 2020.

{¶27} The trial court found that all the shares in the account were marital after finding that husband failed to present sufficient tracing evidence to show that any shares remained his separate property after being commingled with the marital shares. However, as pointed out above, husband presented evidence showing that no additional sale of shares occurred after the sale on August 14, 2012. So, we know that husband's remaining premarital shares were still in the account at the time of

13

termination. Thus, husband's evidence was sufficient to show, by a preponderance of the evidence, that 199.976 shares of the total shares in the account remained his separate property. Husband appears to argue that he should have been allocated the full 293.502 shares that were present in the account at the time of the marriage. However, 93.526 shares of his premarital shares were clearly sold. Nevertheless, husband's remaining premarital shares should have been awarded to him as his separate property and deducted from the amount of shares present in the account as of the last date of the marriage before any division occurred. Accordingly, we sustain this portion of the assignment of error as to the 199.976 shares remaining in the account after the sale on August 14, 2012.

*B. Second Assignment of Error - Child Custody and Parenting Time*

**{¶28}** In his second assignment of error, husband argues that the trial court abused its discretion by granting custody of the parties' minor children to wife and granting him "such minimal parenting time."

<u>B1. Parental Rights and Responsibilities</u>

**{¶29}** In any divorce proceeding, upon hearing the testimony of either or both parents, "the court shall allocate the parental rights and responsibilities for the care of the minor children of the marriage." R.C. 3109.04(A). "Either parent or both parents of any children may file a pleading or motion with the court requesting the court to grant both parents shared parental rights and responsibilities for the care of the children in a proceeding held pursuant to division (A) of [R.C. 3109.04]." R.C. 3109.04(G). "If a pleading or motion requesting shared parenting is filed, the parent or parents filing the pleading or motion also shall file with the court a plan for the exercise of shared parenting by both parents." *Id.* If at least one parent files a pleading

or motion and a shared-parenting plan pursuant to R.C. 3109.04(G), but the plan for shared parenting is not in the best interest of the children,

> the court, in a manner consistent with the best interest of the children, shall allocate the parental rights and responsibilities for the care of the children primarily to one of the parents, designate that parent as the residential parent and the legal custodian of the child, and divide between the parents the other rights and responsibilities for the care of the children, including, but not limited to, the responsibility to provide support for the children and the right of the parent who is not the residential parent to have continuing contact with the children.

R.C. 3109.04(A)(1).

{¶30} "When making the allocation of the parental rights and responsibilities for the care of the children under [R.C. 3109.04] * * *, the court shall take into account that which would be in the best interest of the children."  R.C. 3109.04(B)(1).  In determining the best interest of the children, the court must consider all relevant factors, including, but not limited to, the factors expressly listed in R.C. 3109.04(F)(1). In determining whether shared parenting is in the best interest of the children, the court must consider all relevant factors, including but not limited to, the factors expressly listed in R.C. 3109.04(F)(1) and (2), and R.C. 3119.23.

{¶31} "Although a trial court must follow the dictates of R.C. 3109.04 in deciding child-custody matters, it enjoys broad discretion when determining the appropriate allocation of parental rights and responsibilities." *Cwik v. Cwik*, 1st Dist. Hamilton No. C-090843, 2011-Ohio-463, ¶ 41, citing *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988).  This court has noted that " [t]he knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding

15

cannot be conveyed to a reviewing court by a printed record.' " *Id.*, quoting *Miller*. Accordingly, we review the trial court's determination of custody for an abuse of discretion. *Id.* "Only in cases where the 'court's decision regarding the child's best interest is not supported by competent, credible evidence' should we find an abuse of discretion." *Hatfield v. Hatfield*, 1st Dist. Hamilton No. C-210295, 2022-Ohio-737, ¶ 6, quoting *In re K.S.*, 1st Dist. Hamilton No. C-190754, 2020-Ohio-6863, ¶ 7.

{¶32} The record demonstrates that the trial court expressly considered the required factors in reaching its determination. The court found that wife had requested sole custody and was opposed to shared parenting, while husband was open to shared parenting and was only requesting sole custody if shared parenting was not ordered. *See* R.C. 3109.04(F)(1)(a). The court noted that it did not interview the children. *See* R.C. 3109.04(F)(1)(b). While not providing any specific detail, the court noted that it had considered the interactions between the children, the parents, and other family members. *See* R.C. 3109.04(F)(1)(c). The court recognized that the children were adjusted to their home and care-taking arrangement. *See* R.C. 3109.04(F)(1)(d). The court found that, while wife was distressed, on pain medication, struggling to cope, and threatening to cut her wrists in early 2020, she was treated in an inpatient mental-health facility, was no longer on pain medication and had learned to cope and successfully deal with the tragedies of her life, and was no longer letting these circumstances dictate her behavior and parenting. *See* R.C. 3109.04(F)(1)(e). Regarding husband, the court found that he was being treated by a sex therapist and had admitted to seeking sex through the use of pornography and prostitutes during the marriage, which–according to Dr. Bassman–demonstrated a lack of compassion and objectification of others for his own pleasure and was ultimately about controlling others. *See* R.C. 3109.04(F)(1)(e). However, the court also noted that Dr. Taylor

16

concluded that husband was not a sex offender and was not likely to offend against minors. *See id.*

**{¶33}** The trial court found that any orders would be followed by both parties as both parties had a history of following court orders. *See* R.C. 3109.04(F)(1)(f). The court noted that child-support arrearage was not an issue, and that neither parent had any intention to relocate. R.C. 3109.04(F)(1)(g) and (j). The trial court recognized that there was an allegation from L.O. of sexual abuse by husband and found that continuous and willful denial of visitation was an issue. R.C. 3109.04(F)(1)(h) and (i). The court acknowledged that the guardian ad litem recommended unsupervised parenting time, found that the parties had no ability to cooperate, communicate, or coparent, and found that neither parent had any appreciation or respect for the other parent. *See* R.C. 3109.04(F)(2).

**{¶34}** Beyond that, the court discussed the abuse allegations made by L.O., noted that husband vehemently denied that any abuse occurred, and acknowledged husband's rationale for why he believed L.O. may have said what she did. However, the court found that its focus should not be on whether the abuse actually occurred. Rather, the court said:

> What is important to realize is that this is [L.O.]'s current reality, and [L.O.] must be able to trust that her father will keep her safe. Scolding her for lying is not the way to do this. As Dr. Bassman testified, L.O. must be encouraged to talk to anyone and everyone about her fears and concerns and assure her that she will be believed. It appears that [L.O.] only feels safe with her mother, and father must realize this and work to re-establish her trust.

The trial court then stated that husband had yet to accept and articulate what was necessary to keep L.O. safe mentally and physically. The trial court did not believe that husband's therapist was working with him on anything other than his pornography use and "prostitute use." The court stated, "Father needs a qualified psychologist that may be able to assist him with the father-daughter relationship."

{¶35} Husband argues that the trial court's decision was an abuse of discretion. Husband first disagrees with the trial court's finding related to wife's improvement. He recounts the evidence of wife's behavior at the beginning of 2020 and argues that the trial court should not have dismissed these concerns because they could happen again in the future. However, the trial court's finding that wife had shown significant improvement to the point that her behavior was no longer a concern is amply supported by the record. The nurse practitioner from Lee Side Wellness testified that wife's medical records from that time period were no longer representative of wife because of the improvements that wife made over the past year. She described wife as doing exceptionally well, to the point that she only sees wife every three months. Wife herself also testified about the significant improvements she has made. Notably, even husband testified that wife was a "different person" now than she was at the beginning of 2020 and that he did not have any "major issues" with wife's care. Finally, L.O.'s therapist testified that wife did well during the parent-child-interaction therapy and said that mother learned to apply the skills appropriately. Thus, the trial court's finding that mother's mental health was no longer a concern is supported by the record.

{¶36} Husband also disputes the trial court's finding that his therapist was only addressing issues related to pornography and prostitution during his treatment. However, this finding is supported by the record. Husband's therapist testified that

18

the current treatment goals for husband were continuing to identify possible triggers that could lead husband to wanting to act out sexually, paying attention to current stressors, implementing coping mechanisms and skills, and maintaining social supports. There was no mention of working with husband on understanding why the allegations were made, implementing a safety plan with L.O., or working with husband on his relationship with his daughter. Thus, the court's finding that husband was not working with his therapist in this regard is supported by his therapist's own testimony.

{¶37} Husband further challenges the trial court's finding that the parties had no ability to cooperate, communicate, or coparent. This finding is also supported by the record. When husband was asked if his communication with wife had improved, he responded, "sometimes yes, sometimes no." He said they had bad days and good days. He admitted that their conversations were fueled by emotions from the separation and did not always remain focused on the children. Wife testified that she had concerns about making major parenting decisions with husband because they had not been able to communicate effectively. She said, "We're trying and failing a lot." Wife also testified that she had issues getting to talk to the children during husband's parenting time. Thus, the parties' own testimony supports the trial court's finding in this regard.

{¶38} It is very apparent that the court relied heavily on the testimony of Dr. Bassman when determining what was in the best interest of the children. Dr. Bassman testified that a safety plan should be developed to ensure L.O.'s safety. He specified that husband's focus should be about reconciliation, and not about being right. When asked what safety measures husband intended to put into place with L.O., husband said that he intended to provide a loving home where she felt free to express herself. However, he also testified that he did not feel that L.O. actually believed anything had

happened and said that he avoids talking to L.O. about the situation. Dr. Bassman made it very clear in his testimony that, regardless of whether the allegations were true, not addressing the situation was not the correct approach. He said that this was a cry for help and that the way to help L.O. was to develop a plan that lets L.O. know that certain precautions will be taken in the relationship to protect her safety. Husband did not testify as to any precautions that he had put into place to help protect L.O. in this way. Therefore, the trial court's best-interest findings were supported by the record, and we cannot determine that the court abused its discretion when allocating the parental rights and responsibilities in this case.

### B2. Parenting Time

{¶39} If a divorce proceeding involves a child and the court has not issued a shared-parenting decree, the court must, in accordance with R.C. 3109.151(C),

> make a just and reasonable order or decree permitting each parent who is not the residential parent to have parenting time with the child at the time and under the conditions that the court directs, unless the court determines that it would not be in the best interest of the child to permit that parent to have parenting time with the child and includes in the journal its findings of fact and conclusions of law.

R.C. 3109.051(A). "Whenever possible, the order or decree permitting the parenting time shall ensure the opportunity for both parents to have frequent and continuing contact with the child, unless frequent and continuing contact by either parent with the child would not be in the best interest of the child." *Id*. "The court shall include in its final decree a specific schedule of parenting time for that parent." *Id*. When determining whether to grant parenting-time rights to a parent pursuant to R.C. 3109.051, the court must consider all relevant factors, including, but not limited to,

the factors expressly listed in R.C. 3109.051(D), which include the health and safety of the children.  R.C. 3109.051(C) and (D)(7).

{¶40}  "When considering parenting time, a trial court must follow the dictates of R.C. 3109.051, but it enjoys broad discretion when setting parenting time and determining the conditions under which parenting time will take place."  *Cwik*, 1st Dist. Hamilton No. C-090843, 2011-Ohio-463, at ¶ 42.  We review the trial court's award of parenting time under an abuse-of-discretion standard.  *Id.*

{¶41}  The trial court expressly stated that it considered the factors set forth in R.C. 3109.051(D) when allocating parenting time to husband.  It is clear that the trial court's principal consideration was the health and safety of the children.  The court found that a safety plan needed to be developed which allowed L.O. to feel safe, as recommended by Dr. Bassman.  It expressed that the plan should include husband participating in psychotherapy more than once per month with a psychologist that is provided with a copy of Dr. Bassman's report.  The court noted that, once husband has done so, he can file a motion to lift the restrictions on his parenting time.

{¶42}  Husband argues that the trial court abused its discretion by granting him "minimal" parenting time and implementing parenting time that was more restrictive than it was under the court's previous order.  However, under the trial court's previous order, the parenting time was supervised.  Under the order at issue here, the trial court granted husband unsupervised parenting time, unless the children were napping.  Husband appears to argue that safety of the children could not have been the trial court's concern as the court granted some unsupervised parenting time.  However, even under the previous order, husband was not allowed to have overnight visits with the children.  He was required to return to his own residence while the children slept at paternal grandmother's home.  This is consistent with the current

21

order as the order does not provide for any overnight visits alone with husband. Unsupervised overnight visits were obviously a concern for the trial court as the court also made a specific order that husband was not to have any overnight visits with the children during the holiday schedule. The restriction that husband could not assist the children when they were using the restroom also remained in place. It is apparent that the trial court was considering the health and safety of the children when limiting husband's parenting time, as the trial court was required to do under R.C. 3109.151(D)(7). The trial court's parenting-time order still provides husband with frequent and continuous contact with the children. Given the nature of the allegations and the evidence presented regarding the significance of L.O. feeling safe, we cannot determine that it was an abuse of discretion for the trial court to reduce husband's parenting time under the current unsupervised order to ensure the health and safety of the children. Because we hold that the trial court did not abuse its discretion when determining parental rights and responsibilities or parenting time, we overrule the second assignment of error.

*C. Third Assignment of Error - Child Support*

{¶43} In his third assignment of error, husband argues that the trial court abused its discretion by backdating the effective date of child support to June 1, 2020. In a divorce proceeding, "the court may order either or both parents to support or help support their children, without regard to marital misconduct." R.C. 3109.05(A)(1). "In determining the amount reasonable and necessary for child support, including the medical needs of the child, the court shall comply with Chapter 3119. of the Revised Code." *Id.* "The date chosen for the effective date of child support is reviewed under an abuse of discretion standard." *Portis-Phillips v. Phillips*, 2d Dist. Clark No. 2016-CA-34, 2016-Ohio-7803, ¶ 32, citing *In re P.J.H.*, 196 Ohio App.3d 122, 2011-Ohio-

5970, 923 N.E.2d 389, ¶ 18 (2d Dist.). "The effective date can be the date a motion is filed or 'some other date that coincided with an event of significance in relation to the grounds for child support that was ordered.'" *Id.*, quoting *P.J.H.* at ¶ 20. An abuse of discretion "means that a trial court's decision was unreasonable, arbitrary or unconscionable." *Id.*, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶44} Husband argues that the trial court abused its discretion by backdating the effective date of his child-support obligation to June 1, 2020, as June 2020 "does not relate to anything of note in this case." The trial court noted in its order that the parties were initially sharing the children on an equal-time basis, but mother started having the children on a full-time basis starting in May 2020 when the abuse allegations occurred. The parties' testimony was that the allegations arose in May 2020, and agreed temporary orders were entered on June 18, 2020, ordering that husband was to have no contact with the children until further order of the court. Thus, the trial court's effective date coincided with the significant event that mother began having the children on a full-time basis. Therefore, the trial court did not abuse its discretion in backdating the support obligation and this assignment of error is overruled.

### D. Fourth Assignment of Error - Attorney Fees

{¶45} In his fourth and final assignment of error, husband argues that the trial court abused its discretion by granting wife an award of attorney fees. In a divorce action, "a court may award all or part of reasonable attorney's fees and litigation expenses to either party if the court finds the award equitable." R.C. 3105.73(A). "In determining whether an award is equitable, the court may consider the parties' marital assets and income, any award of temporary spousal support, the conduct of the parties,

and any other relevant factors the court deems appropriate." *Id.* We review the trial court's award of attorney fees under R.C. 3105.73(A) for an abuse of discretion. *Cwik*, 1st Dist. Hamilton No. C-090843, 2011-Ohio-463, at ¶ 102.

{¶46} The trial court awarded wife $15,000 in attorney fees. Husband argues that this was an abuse of discretion. We agree. In awarding attorney fees, the trial court first recognized that many of the issues in the case were complicated by the allegations of abuse and the need for so many professionals and noted that there were also multiple issues related to mother's mental health and medication use. It then found that both parties were struggling to afford the expensive litigation but found that husband had a history of getting financial help from his mother without the need for repayment. The trial court stated, "Equity requires this Court to weigh the various financial situations of the parties and compensate for the unequal ability to afford the litigation."

{¶47} While R.C. 3105.73(A) gives the court the discretion to consider the parties' income when making a determination on attorney fees, it does not give the trial court discretion to consider the income of a party's family members without any additional testimony or evidence to indicate that such family member would be willing to provide the needed assistance. There was no testimony or evidence presented that husband's family would be willing to assist him with the costs of litigation. Because the award was based on speculation, we hold that it was unreasonable for the trial court to assume that husband could get assistance from his family based solely on the testimony that husband had previously received two unrelated loans from his family, particularly when considering that it was wife who testified that she had been receiving assistance from her family with paying for the cost of litigation. Therefore, we sustain this assignment of error.

24

## IV. Conclusion

**{¶48}** We overrule the first assignment of error in part as to the premarital equity in the home and overrule the second and third assignments of error. We sustain the first assignment of error in part as to the marital equity in the home and the Equiniti Stock and sustain the fourth assignment of error. The cause is remanded for further proceeding consistent with this opinion and the law. On remand, the trial court is to enter new orders in accordance with this opinion regarding the marital equity in the home, the Equiniti Stock, the equalization payment, and attorney fees.

Judgment affirmed in part and reversed in part, and cause remanded.

**CROUSE** and **BOCK, JJ.,** concur.

Please note:

The court has recorded its own entry this date.