[Cite as *Brew v. Brew*, 2023-Ohio-1457.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| MERCY BREW, | : | APPEAL NO. C-220140 |
| | | TRIAL NO. DR-2001217 |
| Plaintiff-Appellee, | : | |
| vs. | : | *O P I N I O N.* |
| BENJAMIN BREW, | : | |
| Defendant-Appellant. | : | |

Appeal From: Hamilton County Court of Common Pleas, Domestic Relations Division

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: May 3, 2023

*Mercy Brew*, pro se,

*Benjamin Brew*, pro se.

**ZAYAS, Judge.**

{¶1}   Benjamin Brew ("father") appeals from a judgment of divorce.  In one assignment of error, father contends that the trial court abused its discretion by designating Mercy Brew ("mother") as the residential parent and legal custodian of their minor son, ordering father to pay child support, and declining to award father spousal support.  For the following reasons, we affirm the trial court's judgment.

## Factual Background

{¶2}   On August 14, 2020, mother filed a complaint for divorce against father. One month later, father filed a counterclaim for divorce.  The parties were married in Ghana in 1998, and had two children, an adult daughter, and a minor son with autism who was born in 2007.  Both parties sought sole custody of the minor child, and father sought spousal support.  Mother was awarded temporary custody of the child.

{¶3}   The parties entered into a settlement agreement that divided their assets and debt.  Father retained the marital home in West Chester and a rental property in New York, along with all equity in both homes.  Father retained the 2018 Honda HR-V, and mother retained the 2008 Mazda CX-9.  Each retained their own bank accounts and debt.  Father retained all of his retirement accounts.  The parties' remaining issues, including custody of the minor, child support, and father's claim for spousal support, were heard before the trial court over two days.

{¶4}   Mother testified that she has always been the child's primary caregiver. She attends all of the school meetings regarding her son's IEP and all of his medical appointments. The child requires a great deal of assistance with personal hygiene.  He is incontinent and is frequently wet.   The child was diagnosed with autism in preschool.  His current diagnoses are autism spectrum disorder, mixed receptive expressive language disorder, sensory disturbance anxiety disorder, and CBS speech

2

impairment. The child is prescribed several medications to minimize disruptive behaviors and help him remain calm. Mother testified that father believed the medications were unnecessary and refused to give the child his medicine.

{¶5} Mother is a pediatric doctor who is currently unemployed. In September 2021, she left her job due to the stresses of covid, and her employer's refusal to reimburse her for continuing medical education conferences, and to take care of her son. She is currently looking for a new job. Mother had been making approximately $174,000 per year.

{¶6} Mother testified that it is difficult to find child care for her son. Child care facilities will not accept her son due to his disruptive behaviors. After her daughter left for college, mother hired one of her daughter's high-school friends to feed and supervise her son until she returned from work. Unbeknownst to mother, the friend left her son alone in the house. When the school learned the child was left unattended, the police were called, and mother was charged with child endangering. In June 2018, she pled guilty to attempted child endangering.

{¶7} In July 2019, mother was arrested for two counts of child endangering after her son was found wandering on the road on a Saturday and the following Sunday. That Saturday, mother had taken her son shopping. They returned home, and mother took her daughter shopping and left her son at home. Father was home when they left. Before they left, mother had barricaded the doors so her son could not leave the house. While she was gone, father left the house and her son was able to escape.

{¶8} The following day, mother changed the locks on the house so the doors could not be unlocked from the inside. They went to church, and when they returned

to the home, mother locked and barricaded all of the doors. She and her son fell asleep. Father was home at the time. When she awoke, she learned her son had escaped again. All of the doors were unlocked and the garage door had been opened. Mother believed that father had left the garage door open and unlocked the doors while she slept.

{¶9}   As a result of the charges, the child was placed in father's custody from July 2019-March 2020. From July to November, mother was not allowed to have contact with her son. Mother was forced to leave the marital home and could only visit her daughter when her son was not at the home. When mother regained supervised visitation with the child, she visited him at school, and his teeth had not been brushed, his nails were too long, and his clothes were dirty. Mother had to purchase toothpaste, a toothbrush, deodorant, and nail clippers for his teacher.

{¶10}  Mother pled guilty to attempted criminal mischief. As a condition of probation, mother was required to cooperate with Butler County Children's Services. Mother successfully completed all of the requirements from Butler County Children's Services.

{¶11}  In her current home, mother installed a video alarm and child locks on both doors. The backyard is fenced. Her son has not escaped since the July incident.

{¶12}  Mother and father met in college in Ghana and were married in 1998. Father moved to New York in 2000, and mother joined him in 2002. Father relocated to Cincinnati, and she joined him a year later in July 2013. Throughout the marriage, the two lived apart numerous times due to father's job. Father lived in Houston, Columbus, and New York over the next several years. Mother was financially responsible for all of the family expenses, including the mortgage, utilities, food,

clothing, and medical care. Father had a separate bank account that she could not access.

{¶13} Mother had a considerable amount of debt due to the financial obligations of the mortgage, her son's medication and medical expenses, and all of the household bills. Mother testified that during the marriage, she lived paycheck to paycheck. The mortgage for the family home in West Chester is in her name. As part of the settlement agreement, mother agreed that father can retain both homes and the equity in both homes. The New York home had been the marital residence when they lived in New York. They kept the house when they moved to Cincinnati. Father rents the New York home and keeps all of the rental income from the home.

{¶14} Father testified that he currently earns $88,000 per year as a mortgage underwriter. Father has a bachelor's degree in architecture and a master's degree in statistics. He confirmed that he spent a considerable amount of time living away from the family, and that mother was responsible for the familial expenses including the mortgage.

{¶15} Mother left the marital home in August 2019 and quit paying the mortgage in April 2020. Father admitted that he had not made any mortgage payments. Father testified that he did not make any payments because he is not legally obligated to do so because the mortgage is in mother's name.

{¶16} Father testified that he wanted custody of their son because mother has ADHD and a history of child endangerment and violence.[1] Father admitted that he was working from home during the week that his son escaped from the home twice. He testified that he was driving for Uber on both of those days and he provided the

---

[1] Mother had been charged with domestic violence on two occasions, once for allegedly scratching father, and once for allegedly pushing father. Both charges were dismissed.

police proof that he was driving each day. On cross-examination, he admitted that he provided a request for an Uber driver that he received, and not the Uber GPS data the police requested.

**{¶17}** With respect to spousal support, father was seeking $3,000 per month to pay for the two homes.

**{¶18}** Maureen Kimutis, an intervention specialist with the Lakota School District, testified that she taught the child in seventh and eighth grade. The child was in a specially designed classroom for students with autism. When the child was not allowed to have contact with his mother, the child had an increase in maladaptive behaviors, such as hitting and shoving other students. When the child got frustrated, he used his device to express that he wanted his mother. Once mother was allowed to visit the child, the child exhibited significant changes. The child was much calmer and coped with frustration better. The child stopped exhibiting triggerless negative behaviors.

**{¶19}** When the child was in mother's custody, Kimutis communicated with her frequently. She saw mother every day when she dropped off and picked up the child. Kimutis also had a daily communication log where she wrote notes to the parents. The log went home with the child every day. Mom frequently used the log to communicate with her. Occasionally, father would respond to her comments when he had custody of the child. The child received his afternoon medication at school. The school began administering the morning dose because mother was concerned that the child was not receiving the medicine at home.

**{¶20}** Patrick McGill prepared a parenting report at the court's request. McGill recommended that mother should be designated the residential parent and

legal custodian of the child because she was more capable of meeting the child's needs. Based on his observations, the child sought physical touch with mother to calm down and communicated with her. The child did not interact with father during the time he interviewed father. The child rocked back and forth during the visit while playing with his device. Father sat silently while the child played with the device. McGill testified that father had "difficulty giving me straight answers." McGill was concerned that father would make decisions about the child based on his own insight to the exclusion of mother and the medical professionals.

{¶21} McGill spoke with the school principal who reported the child is more attentive at school when he is in his mother's custody. The principal stated that mother worked hard to ensure the child had a good mindset for learning. McGill also spoke with the child's pediatrician who reported that mother was the only parent who attended appointments and interacted with the doctor. The nurse practitioner at the Psychiatric Department of Children's Hospital reported that mother accompanies the child to his appointments. McGill received information from Butler County Children's Services who reported that the school was concerned because father reportedly informed the school that he did not "do medications." McGill opined that father did not grasp the overall needs of the child.

{¶22} The trial court issued a written decision designating mother as the residential parent and legal custodian. The court ordered father to pay child support in the amount of $326.26 per month. The court imputed an income of $173,380 to mother, and deviated the child-support obligation of father downward by $250 because of mother's ability to earn more income. After considering the spousal-

support factors in R.C. 3105.18(C), the court declined to order mother to pay spousal support to father.

**{¶23}** Father appeals arguing that the court abused its discretion in denying his request for spousal support and designating mother the residential parent and legal custodian of the minor child and ordering him to pay child support.

### Allocation of Parental Rights

**{¶24}** Father contends that the trial court considered, then disregarded, mother's past charges for child endangerment in designating mother the residential parent and legal custodian of the child. Father also avers "that it is not in the best interest of an Autistic minor child to be left in the care of a mother who displays ADHD symptoms."

**{¶25}** The trial court has broad discretion in determining the appropriate allocation of parental rights. *See Owens v. Owens*, 1st Dist. Hamilton No. C-210488, 2022-Ohio-3450, ¶ 31. "The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record." *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988). Thus, we review the trial court's determination of custody for an abuse of discretion. *Id.* "Only in cases where the 'court's decision regarding the child's best interest is not supported by competent, credible evidence' should we find an abuse of discretion." *Hatfield v. Hatfield*, 1st Dist. Hamilton No. C-210295, 2022-Ohio-737, ¶ 6, quoting *In re K.S.*, 1st Dist. Hamilton No. C-190754, 2020-Ohio-6863, ¶ 7.

**{¶26}** When allocating parental rights, the trial court must determine what is in the best interest of the child. R.C. 3109.04(B)(1). In making this determination, the trial court considers all relevant factors, including the statutory factors set forth in R.C. 3109.04(F)(1)(a)-(j). R.C. 3109.04(F)(1). R.C. 3109.04(F)(1)(h) requires the

court to consider:

Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code or a sexually oriented offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child.

**{¶27}** In this case, as father concedes, the trial court considered mother's past conviction for attempted child endangerment and two subsequent charges for child endangerment. Mother pled guilty to attempted child endangering in 2018. One year later, mother was charged with two counts of child endangerment, which were

resolved when mother pled guilty to attempted criminal mischief.

**{¶28}** After hearing mother's testimony and explanation of the charges, the trial court found that the "charges were sufficiently explained. No issues regarding such allegations have arisen since Mother has had the sole responsibility for the child." McGill also considered the charges and recommended that mother should be designated the residential parent and legal custodian of the child because she was more capable of meeting the child's needs. McGill testified that mother's explanation was genuine, reasonable, and forthright.

**{¶29}** With respect to mother's ADHD diagnosis, father claims it is not in the child's best interest to be left in the care of a mother with ADHD symptoms. McGill noted in his report that mother has had ADHD since childhood and has been treated since 2018 at Restorative Wellness. There is no evidence in the record that mother's ADHD prevents her from adequately caring for the child.

**{¶30}** The record reflects that the trial court fully considered all of the relevant statutory factors and set forth specific, meaningful findings under each statutory factor. The court noted the close bond between mother and the child and father's acknowledgment that "[a]ny change in the child's schedule will cause a very adverse effect on the child's learning and behavior." Based on this record, the trial court did not abuse its discretion in allocating parental rights.

### Child Support

**{¶31}** Father asserts the court abused its discretion in "refusing to order the Appellee to pay child support." He further argues that he should not be burdened with child support when mother earns more than twice his income.

**{¶32}** When issuing an order of child support, the trial court must calculate the amount of support "in accordance with the basic child support schedule, the applicable worksheet, and the other provisions of Chapter 3119." R.C. 3119.02. The child-support amount that results from the use of the basic worksheet is presumed to be the correct amount of child support due. R.C. 3119.03. However, under R.C. 3119.22, a court may deviate from the guideline amount of child support, if, after consideration of the factors set forth in R.C. 3119.23, the court determines that the guideline amount "would be unjust or inappropriate and therefore not in the best interest of the child." R.C. 3119.22.

**{¶33}** Here, the trial court calculated the child-support amount in accordance with the child-support worksheet. The trial court recognized that mother was voluntarily unemployed and imputed an income to her of $173,380. The court determined that the actual amount was unjust, inappropriate, and not in the best interest of the child due to the difference in the relative financial resources of the parties. Accordingly, the court granted father a downward deviation of $250 per month. Thus, the trial court considered the disparity in income between the parties under R.C. 3119.23(E) in granting father a downward deviation. There was competent and credible evidence to support the trial court's decision; it was not unreasonable, arbitrary, or unconscionable.

### Spousal Support

**{¶34}** Father next argues that the trial court abused its discretion in failing to award him spousal support because the award was necessary to enable him to maintain his standard of living.

**{¶35}** A trial court has "broad discretion" in determining whether to award

spousal support based on the facts and circumstances of each case. *See Morrison v. Walters*, 1st Dist. Hamilton No. C-210398, 2022-Ohio-1740, ¶ 3. When determining whether spousal support is appropriate and reasonable, the trial court must consider all the following factors:

(a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;

(b) The relative earning abilities of the parties;

(c) The ages and the physical, mental, and emotional conditions of the parties;

(d) The retirement benefits of the parties;

(e) The duration of the marriage;

(f) The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;

(g) The standard of living of the parties established during the marriage;

(h) The relative extent of education of the parties;

(i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;

(j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;

(k) The time and expense necessary for the spouse who is seeking

spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;

(l) The tax consequences, for each party, of an award of spousal support;

(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;

(n) Any other factor that the court expressly finds to be relevant and equitable.

**{¶36}** The court considered all of the statutory factors and made findings regarding the relevant factors, including the parties' income and mother's voluntary unemployment, father's retirement benefits and mother's lack of retirement benefits, the 21-year marriage that included long periods when they lived apart, the difficulty mother will have finding care for the child when she resumes employment, their middle-class standard of living while mother paid all expenses and father's responsibility for the New York home, their comparable education, father's retention of both homes and the equity, and mother's assumption of all financial responsibilities during the marriage that left her in a great deal of debt.

**{¶37}** The other factors that the court found relevant was that father requested $3000 per month to enable him to continue to own both of the marital homes, mother's ability to earn more than father, and that mother is not currently earning income, in part because of her child-care responsibility.

**{¶38}** The trial court's decision specifically states that the R.C. 3105.18 (C)(1) factors were considered. Moreover, it is clear from the court's recitation of its factual

findings that the court considered the parties' relative earning capacities, the relative assets of the couple, and mother's unemployment and potential day-care costs when she resumed employment. The court concluded that father did not need a spousal-support award. On this record, this conclusion is not arbitrary, unreasonable, or unconscionable.

**{¶39}** Accordingly, we overrule the sole assignment of error.

## Conclusion

**{¶40}** Having overruled the assignment of error, we affirm the trial court's judgment.

Judgment affirmed.

**CROUSE, P.J.,** and **KINSLEY, J.,** concur.

Please note:

The court has recorded its own entry this date.