[Cite as *Iranpour-Boroujeni v. Emami*, 2024-Ohio-2546.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| FARNAZ IRANPOUR-BOROUJENI, | : | APPEAL NOS. | C-220129 |
| | | | C-220151 |
| Plaintiff-Appellee/ | : | | C-230345 |
| Cross-Appellant, | | TRIAL NO. | DR-1901118 |
| vs. | : | | |
| BABAK EMAMI, | : | *O P I N I O N.* | |
| Defendant-Appellant/ | | | |
| Cross-Appellee. | : | | |

Appeals From:   Hamilton County Court of Common Pleas, Domestic Relations Division

Judgments Appealed From Are:   Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal: July 3, 2024

*Zachary D. Smith, LLC, Zachary D. Smith* and *Colin C. Smith,* for Plaintiff-Appellee/Cross-Appellant,

*Sams Fischer, LLC,* and *Robert S. Fischer,* for Defendant-Appellant/Cross-Appellee.

**BOCK, Presiding Judge.**

{¶1}   In this divorce case, defendant-appellant/cross-appellee Dr. Babak Emami ("Husband") raises seven assignments of error challenging several decisions by the trial court. We sustain his second assignment of error and hold that the trial court abused its discretion when it valued the equity in 6684 Wyndwatch Drive ("Wyndwatch") based on rental payments applied to the mortgage and divided the equity in the property because plaintiff-appellee/cross-appellant Dr. Farnaz Iranpour-Boroujeni ("Wife") also received a share of those rental payments elsewhere in the property division. We reverse the trial court's valuation and division of the equity in Wyndwatch and remand the matter to the trial court to recalculate the equity or make additional findings.

{¶2}   We overrule Husband's remaining six assignments of error. First, the trial court's exclusion of evidence of his father's repayment of a loan was not unreasonable based on Husband's persistent discovery misconduct. Second, the trial court acted within its discretion when it chose an alternative valuation date of the parties' retirement benefits. Third, the trial court reasonably relied upon the parties' expert's valuation of Husband's business and its reliance did not create a "double dip" of Husband's income. Fourth, the trial court properly denied Husband's motion to sell his business. Fifth, the trial court did not abuse its discretion by awarding Wife spousal support. And finally, the trial court acted within its discretion when it denied Husband's motion for relief from judgment.

{¶3}   In her sole assignment of error, Wife claims that the trial court abused its discretion when it denied her request for attorney fees. But the trial court reasonably concluded that it was inequitable to issue an award of attorney fees based on the parties' assets and income, and Husband's support obligations.

**{¶4}** Accordingly, we affirm the trial court's judgment in part, reverse it in part, and remand the matter to the trial court for further proceedings.

## I. Facts and Procedure

**{¶5}** After nearly 20 years of marriage, Wife filed for divorce from Husband in June 2019. During their marriage, Wife and Husband became the parents of two children and amassed several business and real properties in the Cincinnati area.

**{¶6}** Relevant to this appeal is Wyndwatch, the house where Husband's parents reside; Husband's oral surgery practice, "Dr. Emami, Inc.;" and a rental property located at 5485 Michelle's Oak Lane, Unit K ("Michelle's Oak"). They also owned Husband's corporate real estate limited liability company, "7462 Jager Ct., LLC;" Wife's dental practice, "Farnaz Iranpour-Boroujeni D.D.S., Inc.;" and their marital residence located at 356 Hawkinsridge Lane.

*Pretrial Matters*

A. Child and Spousal Support

**{¶7}** Following a hearing, the magistrate issued a Civ.R 75(N) temporary support order requiring Husband to pay Wife $13,000 in monthly spousal support and $1,930.92 in monthly child support. In December 2019, Wife filed a motion to hold Husband in contempt for "significant arrearage" due to his "refusal to pay the amount." That motion was dismissed without prejudice when Husband "substantially compl[ied] with his monthly support obligation."

**{¶8}** In April 2020, Husband moved to modify the child- and spousal-support orders. He renewed that motion in March 2021 and claimed that the pandemic caused him to shut down his practice and that he was "earning no income for several months." He also explained that he had paid three months of child support in 2020, "paid an additional $30,000.00 in January 2021 directly to [Wife] by agreement of

3

the parties," and "continued to pay some support since January."

{¶9} In May 2021, Wife moved for a contempt order, arguing that Husband failed to pay the portion of their children's education expenses mandated by the temporary order. In July 2021, Wife again moved to hold Husband in contempt for failing to pay child support, spousal support, and their son's tuition. She claimed that Husband owed $214,233.77 in unpaid support. In November 2021, she filed another motion to hold Husband in contempt of the support order, citing his $254,263.83 in unpaid support.

B. Financial Accounts

{¶10} Initially, a temporary order restrained the parties from withdrawing or spending funds held in any financial institution. In February 2020, Wife moved for a division of the parties' "financial accounts (specifically their combined joint and individual bank checking and savings accounts)" and to hold Husband in contempt of the temporary order. She alleged that Husband unilaterally withdrew $38,000 from the parties' joint bank account.

{¶11} In February 2021, the parties jointly moved to divide an investment account that was "marital but in [Husband]'s name." The trial court granted that motion. It divided the $1,265,000 in the account after liquidating the investment assets and reserved the issue of liability incurred for capital gains for trial. Two months later, Wife filed to hold Husband in contempt for failing to divide that investment account. The trial court granted that motion, ordered Husband to pay $1,204 in attorney fees, sentenced him to 60 days in jail, and imposed a fine. Husband's contempt was purged after he paid Wife her half of the account and her attorney's fees.

C. Properties

{¶12}  In August 2020, Husband, citing medical issues and the March 2020 Ohio Department of Health Director's emergency order prohibiting nonessential surgeries, moved to sell his medical practice and the real estate associated with it, and to divide the proceeds equally between the parties. Days later, Wife opposed that sale and moved for an order compelling Husband to cooperate with "previously-agreed-upon business valuations" and real property appraisals, for inspection of Husband's property under Civ.R. 34, for an accounting of the funds in jointly-held financial accounts, and for attorney fees.

{¶13}  The trial court ordered Husband to schedule appraisals of the Hawkinsridge Lane, Michelle's Oak, Wyndwatch, and Jager Court properties by the end of the following day. All other matters were held in abeyance. In September 2020, Wife asked the court to hold Husband in contempt of that appraisal order, explaining that Husband unilaterally delayed the appraisal when his office administrator "turned away" the appraiser on the agreed appraisal date. In December 2020, Wife moved for an order compelling Husband to "provide the documents necessary to complete the previously agreed valuation of the parties' businesses." The trial court granted that motion and ordered Husband to provide documents to the appraiser.

{¶14}  In November 2020, Wife moved for an order directing the sale of the parties' marital residence on Hawkinsridge Lane. Her motion included exhibits indicating that the parties agreed with the appraised value of the marital residence and Michelle's Oak. Her motion indicated that while the parties agreed to sell the marital residence, Husband failed to respond to recent requests to follow through with the sale of the property. Husband appears to have agreed to the walkthrough, as the trial court found Wife's motion moot following a hearing.

5

{¶15} After the trial court postponed the property hearing due to Husband's medical issues, he moved for an order instructing Wife to "pay the costs associated with the Wyndwatch property" because of her claim that the property was marital and her attempt to recover half of the equity. He argued that "[i]f she is provided half the equity, it would only be just for her to be required to pay half the mortgage, insurance, taxes and maintenance." The trial court granted that motion and issued an order stating "[t]he Wyndwatch property shall be listed for sale within 30 days of this order," with the proceeds from the order escrowed in Wife's trust account.

{¶16} Husband also sought an order to sell Michelle's Oak and to "hold or divide rent proceeds." The trial court granted that motion and ordered the sale of Michelle's Oak and that the rent payments and proceeds from the sale of the rental property be placed in an escrow account. The trial court reserved the issue of past rent for trial. Weeks later, Wife moved to hold Husband in contempt of that order, citing his failure to deposit the December 2020 rent payment into the escrow account.

D. Discovery Disputes

{¶17} In September 2020, Wife moved to compel Husband's discovery responses that had been due in August 2020. Following a hearing, Wife renewed her motion to compel, arguing that Husband provided incomplete and illegible interrogatory responses and failed to produce any requested documents. The trial court granted that motion and ordered Husband to comply with her discovery requests by the end of October 2020. Husband moved to compel Wife's discovery responses because he had to expend energy, time, and money to find Wife's assets in Iran.

{¶18} In early November 2020, Husband moved to extend the deadline for his discovery responses, claiming that the parties successfully mediated, without attorneys, all parenting and property matters. That same day, Wife moved for

6

contempt based on Husband's noncompliance with the trial court's discovery order. While the trial court extended the deadline, Wife renewed her motion for contempt roughly two weeks later due to Husband's additional incomplete responses.

{¶19} In December 2020, Wife filed another motion to compel Husband's responses to her August discovery requests. The trial court granted that motion. Three weeks later, Wife moved for sanctions based on Husband's "failure to respond to discovery in contempt of the [order compelling discovery]." The trial court granted that motion, found Husband in contempt for his repeated noncompliance with discovery orders, and awarded Wife $5,673 in attorney fees. That contempt order was purged after he paid those fees.

{¶20} Meanwhile, Wife moved to join Husband's parents, Dr. Jafar Emami ("Jafar") and Eftekhar Sadat Rastegar Touhid, as third-party defendants. She explained that his parents were "in possession of, control of, or claiming an interest in" Wyndwatch. In February 2021, the trial court granted her request and joined Husband's parents as third-party defendants.

{¶21} In April 2021, Wife requested documents from Husband's parents showing money exchanged between Husband's parents and Husband, their income, and banking information. After they twice failed to respond, Wife filed a motion to compel and asked the court to prohibit his parents from using or introducing any of the requested documents. Husband opposed the motion to compel on his parents' behalf. Wife then sought to exclude any of Jafar's documents, arguing that Husband's attorney was working on behalf of his parents. The trial court granted the motion and prohibited Husband from introducing documents received from his father.

{¶22} In late July 2021, Wife argued that Husband should be precluded from testifying in any way about payments from Jafar to Husband or to third parties. And

7

after Husband's attorney sent Wife Jafar's discovery responses, Wife moved to sanction Husband's parents and to prevent those responses from being used as evidence at trial. The trial court ruled that "[n]o exhibits will be entertained as evidence that came directly from Dr. Jafar Emami."

### *The trial*

{¶23} The property hearings began in early August 2021 but were continued until December 2021 due to concerns over Husband's health.

A. Income

{¶24} On the first day of the trial, the trial court designated Rebekah Smith an expert forensic accountant. Smith reviewed Husband's and Wife's incomes for support purposes. Her report analyzed their income based on "historical tax returns and w-2s and looking at the financial statements as to where they're at year-to-date."

1. *Husband's income*

{¶25} Husband was an oral surgeon. Smith identified his sources of income as "officer compensation" and "business income." Relying on data from the first half of 2021, Smith initially projected an $879,522 annualized income for Husband for 2021. When averaged with his income from 2018 and 2019, Husband's three-year average income was $790,144. Smith testified that his income trends "more towards 2019," and averaging his 2019 and annualized 2021 incomes yielded an $841,666 average income. Husband also collected $58,563 in rent from his medical practice in 2019, but he reduced his practice's rent to $30,000 in 2021. Those rental payments to him increased his two-year average to $904,844. In addition, his practice's financial statements included a $29,222.18 payment to Husband's divorce attorney in March 2021, which made his 2021 income $934,066. Finally, with the $25,000 that Husband

deferred from his salary and put into his 401(k), Smith testified that Husband's 2021 salary was $945,566.

{¶26} Smith testified again in December 2021. She had reviewed financial statements through October 31 and supplemented her report. She explained that his income is the practice's bottom line, and "up [un]til June, the average profitability per month was about $73,000 a month. For the last four months the average profitability has been $83,000 a month." Based on the more recent financial statements, she increased Husband's annualized 2021 income to $926,470. This resulted in an $805,793 three-year average.

{¶27} Husband testified that he had no income since September 2019 and described various health issues that hampered his ability to make an income. He testified that, due to his health issues, he was only capable of teaching and could not perform surgery. Days before testifying, he filed for unemployment disability benefits. But Husband acknowledged that an oral surgeon at his practice generates revenue, and he keeps any profit after he compensates this oral surgeon. He anticipated that the surgeon would leave his practice within months of his testimony, leaving him zero income. Based on that prediction, he sought spousal support.

{¶28} In February 2021, Husband purchased a 4,000 square foot house for $700,000 with a $217,000 down payment. While his financial disclosure form identified his monthly income as $62,492.54, he testified that he "probably" lied on that form. Husband vacationed in Colombia in August 2021, and twice in Naples, Florida, when his support balances were in arrears.

### 2. Wife's income and expenses

{¶29} Smith determined that Wife's 2021 income was $143,616. Wife started her dental practice in 2008 and considered it a "very rewarding practice because

people really need help." Most of her patients use Medicaid and "have not had any dental help for a long time."

{¶30} She worked at this location because she wanted "flexibility, I wanted to be able to, you know, get to the house or get the kids quickly." She testified that this location "was [Husband's] suggestion. He found the place. * * * [H]e picked the place. Mostly just so I can have flexibility." She recognized that her practice is "at the lower end" compared to other dentists. But her practice was "doing the best that it has ever done." At the time of trial, she saw 40 to 50 patients during a four-day work week. When asked if she could work 40 hours per week, she explained that she had "[their son] to pick up. And this is our agreement that we've always had, that we put – put the children first. So I don't want to be working a lot and not attend to my kids."

{¶31} Wife purchased a $399,000 house with a $60,000 down payment. She paid $20,000 to finish the basement. She was responsible for 30 percent of her children's $30,000 tuition. She withdrew $30,000 from the joint savings account following a discussion with Husband about support issues "because he was way far behind on his child support." Wife had two accounts with "about 13 in one" and "about 11 in the other one." Also, a $970,000 investment account was divided before trial.

B. Business valuations

{¶32} David Justice, the parties' accountant for years, handled their payrolls, accounting, financial statements, business entity tax returns, and personal returns. He prepared financial statements representing "all the revenue from patients and insurance companies." On Justice's recommendation, the parties jointly hired Penny Lutocka to value their companies. The parties stipulated that Wife's dental practice was worth $149,000 in September 2020 and $163,000 in June 2020. They disagreed, however, about the value of Husband's business.

10

### 1. *Lutocka's valuation*

{¶33} Lutocka, a certified public accountant and accredited senior appraiser, had performed business valuations for 11 years with experience appraising dental and medical practices. The trial court, without objection, designated Lutocka as a "business valuation and financial forensics expert." Lutocka's report valuing Husband's business identified three approaches to valuing a business: an asset-based approach, a market-based approach, and an income-based approach. Lutocka relied on the asset-based and market-based approaches to determine the value of Husband's oral surgery practice.

{¶34} She explained that the asset approach is based on a company's assets. Considering the balance sheets, accounts receivables, inventory, furniture and fixtures, computers, medical equipment, a car, goodwill, other intangibles, and liabilities, Lutocka valued the business at $1,082,283 in June 2019 and $768,540 in September 2020.

{¶35} The market approach compares similar businesses. Comparing Husband's businesses to 14 similarly-sized companies, she selected "the median multiples of revenues" and earnings to value his business at $1,147,305 in June 2019, and $748,800 in September 2020.

{¶36} The income approach is based on earnings. Lutocka's valuations did not factor in the parties' individual salaries.

### 2. *Husband's valuation*

{¶37} Husband disagreed with Lutocka's valuations. Specifically, Husband took issue with her asset-based valuation because the practice had significantly less cash-on-hand. He also disagreed with her valuation of the furniture, fixtures,

computers, and medical equipment because they were allegedly worth much less than her valuation when he purchased the practice.

{¶38} But Husband's biggest complaint with Lutocka's valuation was that he "know[s] what the value is. I know how to build a practice. These are just overrated. She – there is no practice that you will ever include cash assets in the price for the value of the practice. It's basically on goodwill and equipment, and these are way overrated." He testified that he received an offer to purchase his business from a group of surgeons consisting of a friend and some acquaintances. Husband estimated that his practice is worth "no more than $250,000."

C. Wyndwatch

{¶39} Husband's parents lived at Wyndwatch, which was valued at $465,000 in September 2020 and $500,000 on July 1, 2021. Husband and Jafar were the joint title owners of the property, which was purchased in September 2020 for $380,000. Wife testified that "we basically became responsible for making all the payments because it's very hard to basically bring anything from the other side." The parties' stipulations included an amortization schedule.

{¶40} Wife testified that Husband used $62,935.58 from their joint marital account for Wyndwatch's down payment. The mortgage payments came from different sources: 1.) the parties' joint bank accounts, 2.) Husband and his brother's joint bank account, which Wife believed was funded with marital income; 3.) Husband's surgery practice's checking account; 4.) Husband and Jafar's joint checking account, which Wife believed was marital property; and 5.) rental income from Michelle's Oak.

{¶41} Jafar had worked as a physician and a teacher in Iran. While Jafar owned property, a pension, and financial accounts in Iran, Wife explained that "it's very difficult to bring money here just because of the relationship within Iran and

12

America" and Jafar "didn't really have any money to put" in Husband and Jafar's joint account, which was why she believed that the money came from the marital income. Husband testified that Jafar alone funded his and Jafar's joint account.

**{¶42}** Though Wife believed at one point that the rental income from Michelle's Oak was deposited into the parties' joint bank accounts, she testified that the income "was basically going to [his parents'] account." According to Wife, after October 2018, Michelle's Oak deposits were directed to Jafar, who endorsed the checks to pay the Wyndwatch mortgage, and those deposits included the mortgage account number. She acknowledged the rent was $1,250, which was less than the Wyndwatch mortgage payment. Husband testified that the rent payments were "[n]ot really" used to pay Wyndwatch's mortgage and that the checks were endorsed with Wyndwatch's mortgage loan number because Jafar "did not have a checking account at the bank, so they used the loan number."

D. Note payable to Husband

**{¶43}** Wife recalled finding in the marital residence an eight-page handwritten document showing loans from Husband to Jafar. The document was "a log on the balances, payments, everything" to "Dad." Wife testified that "his parents didn't have any income, he would pay for almost all the expenses." All told, the note identified a total of $275,513 loaned to Jafar. A handwritten summary of the loans stated:

| Dad | 11/24/2013 | $114,537.00 |
|---|---|---|
| Dad 2 | 7/24/2014 | $26,626.00 |
| Dad 3 | 11/25/2014 | $12,483.00 |
| Dad 4 | 3/26/2015 | $11,568.00 |
| Dad 5 | 7/30/2015 | $10,414.00 |
| Dad 6 | 6/13/2016 | $24,264.00 |
| Dad 7 | 12/10/2016 | $21,268.00 |
| Dad 8 | 9/12/2017 | $21,873.00 |
| Dad 9 | 10/8/2018 | $32,480.00 |

13

According to the note, Husband loaned Jafar money for Wyndwatch's mortgage from November 2013 to August 2015. When reduced by the mortgage payments and down payment, according to Wife, Husband loaned Jafar $75,715.

{¶44} Husband agreed that he wrote the ledger and kept that ledger through October 2018. And he testified that the money loaned to Jafar came out of their joint account. Husband explained that the note constitutes "expenses that I had with my dad" and that he had an agreement with Jafar:

> [W]henever he didn't have time or if they were on a trip, or, you know, for some reason, I would take care of payments, and then he would pay me in cash because everything was in cash. So I would * * * accumulate the cash and I would write checks for it.

{¶45} Husband testified that Jafar repaid the debt in cash and had a ledger documenting those repayments. In fact, Husband wrote down the debts because Jafar "told me to write it, he was going to pay me back, and he wanted to know what I had expended." And Husband gave Jafar copies of his records, "[s]o every time he paid, I gave him a ledger – a copy of what – so he has it."

{¶46} Husband explained that Jafar periodically received money from Iran. Jafar used that money to repay Husband and placed the rest in the safe in the parties' marital residence. Husband testified that he used Jafar's repayments to pay for renovations to the marital home. According to Wife, renovations cost about $100,000. Husband, however, testified that he was responsible for paying the contractors and the renovations totaled $323,000. While he had some invoices, he testified that some contractors operate a cash business and "don't want to give you invoices."

E. Rental income

{¶47} Wife identified $25,000 worth of missing rental payments between when she filed for divorce in June 2019 and the sale of Michelle's Oak in March 2021. Wife believed $11,250 of the missing $25,000 paid Wyndwatch's mortgage, but she could not account for the remaining amount. Husband testified that the income was not divided due to the "expenses associated" with repairs on the property.

F. Iranian property

{¶48} Wife hired Abbas Hadjian to determine her Iranian real estate interests and review an Iranian land surveyor's report. Hadjian was a certified family law specialist who spoke Farsi, was an expert on Iranian law, and devoted most of his consultation work to Iranian law and procedure.

{¶49} The land-surveyor's report was written in Farsi and translated into English by an "official translator." Hadjian testified that the translation accurately explained that Wife owned property in Iran, but the rest of the translation seemed "manufactured." The report did not list the land surveyor's address and lacked "documents to support who this gentleman was." Though the report indicated that the surveyor was a member of the Construction Engineering Disciplinary Organization, Hadjian "checked that organization" and "[h]is name is not there." Moreover, while the surveyor indicated that he was officially appointed by the government, Hadjian found "no document for assignment." Hadjian found it strange that the report contained no images of the property. And one of the "major defects" Hadjian found was the document was not "authenticated by the Department of Justice."

{¶50} Hadjian believed that two items were "inserted" by the translator: a "certification of evaluation" title to the surveyor's report and a conversion of the property's value from "the Rial to the dollar." He explained that the original surveyor's

15

report would not have included that conversion or listed the value in dollars. Hadjian explained that the document "is an interpretation of the [surveyor's report,]" not a translation. To Hadjian, the only reliable information on the translated document was the number of the deed.

{¶51} Turning to Wife's property interests, her father purchased one property before she was born and a second when she was a child. The two properties were used as rental properties. Her father divided the properties in the names of his wife and his children. While the properties were placed in her and her siblings' names, Hadjian testified that this "doesn't mean that it belongs to the children."

{¶52} According to Hadjian, in 2015 the children transferred their shares to their mother in a life estate and gave their mother "the right to sell, do whatever she wants to do, with the right of survival, meaning that if they survive mom, their interest will come back to them." At the time of the trial, Wife's mother was still alive. Before Hadjian's investigation, Wife did not believe she had any interest in that property. As far as Wife could tell, "my mom has complete control over all of it. She can sell. She can do whatever she wants. But then after she passes away, they – they're promised to us." But Hadjian determined that Wife owned contingent interests in both properties.

G. Support

{¶53} Husband testified that he did not pay spousal support as ordered at the start of the pandemic because he shut down his practice and "didn't have any income." Two or three months later, he restarted his practice but continued to not pay support because he "asked for a modification" as his "incomes were really, really low."

{¶54} In December 2020, Husband made a lump-sum payment of $30,000. He started making regular payments at that point, though it was not the full amount because his "income has been reduced significantly." He had been paying "[a]bout

16

$10,000 a month," even though he testified he had not worked for three months. He had been paying for their car and health insurance, plus the children's other living expenses, which he claimed went on his credit card. Husband testified that his $370,000 income was pretax income. Taxes reduce his income by "[a] huge amount."

*Trial court's property order*

{¶55} In its 47-page order, the trial court made extensive factual findings. All told, Husband was ordered to pay Wife "$486,760.50 to equalize the division of property, not including [his] child and spousal support arrearage." Relevant here, the trial court found that 1.) the marriage ended on June 17, 2019; 2.) Husband's practice was worth $1,115,000; 3.) the equity in Wyndwatch was marital property worth $241,906; 4.) $22,500 in rental payments was marital property; 5.) Wife's "contingent interest in the Iranian property is separate property"; 6.) Husband used marital funds to loan his father money, and the note payable is a marital asset worth $72,115; and 7.) December 31, 2020, was the appropriate date for dividing the parties' retirement accounts because of Husband's failure to pay temporary support.

{¶56} The court ordered Husband to pay $12,500 in monthly spousal support for six years in addition to "any and all arrearage," and denied Husband's request for spousal support. It found Husband in "willful contempt" of the temporary-support order and ordered him to pay his $224,437.71 support arrearage within 30 days of the trial court's order. It also required Husband to "pay his portion of the children's school tuition in the sum of $13,930.54" within seven days of the order.

{¶57} Finally, the trial court denied Wife's request for attorney fees, finding it inequitable based on the parties' "abundance of marital assets and income," and her spousal-support award.

*Husband's Civ.R. 60(B) motion*

**{¶58}**  In August 2022, Husband filed a Civ.R. 60(B) motion for relief from judgment, arguing that newly-discovered evidence and fraud warranted relief. He claimed that Wife's sister "is currently involved in litigation" against Husband, and that she testified in July 2022 "that all assets in Iran are the children's assets." He asserted that Wife's testimony at the property hearing constituted fraud on the court.

**{¶59}**  At the Civ.R. 60(B) hearing, Wife's sister testified that although the properties were in the children's names, it "is not actually true" that the Iranian properties were owned and controlled by the children. She stated that she did not receive income from Iran. While recognizing that she stated in a deposition that she received money from Iran that she gave to their mother, she clarified that she meant "if there's anything I don't care about it and it goes for her house."

**{¶60}**  Husband's counsel read from the deposition transcript,[1] where Wife's sister testified:

> The assets are under our name, but we want to give the money to her to spend. We do give the money from our money to her to spend is your question so she doesn't have anything under her name. We as children give her money as whatever money is back in Iran.
>
> So if [we] as children want to sell something, we will sell it because it's our money. The things are ours. We * * * can choose to give her money. If I wanted to bring my money here, I can. If I want to give it to my mom, it's my money, I can give it to my mom, so this is what she's having the income from.

---

[1] The deposition transcript is not in the record.

At the Civ.R. 60(B) hearing, she explained that this was her previous belief and "if there's anything by default it will go to her, but I've never given her money."

{¶61} Throughout her hearing testimony, Wife's sister made it clear she "do[es]n't know what's going on there" and "didn't know" how the inheritance was managed. She "do[es]n't even know if there's any income or anything. The point that I never even bothered to ask. I don't care." She was told by her "parents like 20 years ago that we're going to be inheriting something at some point and that's it." She didn't "know what my – other people – siblings do." She had not reviewed Hadjian's report before testifying at the deposition.

{¶62} Husband hired Amin Alemohammad to prepare a report[2] based on public records in Iran available in 2019. He reviewed Hadjian's report and disagreed with Hadjian's conclusion that Wife's property interest was conditional. He testified that the children were the property owners, but "the condition part is coming to the mother share." Iran has a "true kind of ownership," one is "ownership and one condition ownership." Their mother has "1.5 share as a whole the property," which was transferred from Wife "with this condition," but because her mother did not own the entire property, she cannot transfer the condition. He saw no waiver of property rights by the mother in the documents, so he believed Wife still had ownership, but "on the condition ownership as a 1.5 until the mom transfer it completely to her or another." Alemohammad testified that Wife received an unconditional interest in the properties after her father's death.

{¶63} Hadjian testified that the report did not consider any documents that were not referenced or evaluated in Alemohammad's report. He repeated his

---

[2] Alemohammad's report is not in the record.

understanding that wife had a conditional interest in the properties, explaining that a conditional interest in Iran means that their mother retains all control over the properties, "to keep it, to benefit from it, to rent it." Following their father's death, the children and their mother inherited his interest, and their mother transferred her interest to the children conditioned on their mother's control over the properties for the remainder of her life.

{¶64} The trial court denied Husband's motion for relief from judgment. It explained that Husband failed to show that Alemohammad's and Wife's sister's testimony were not discoverable with due diligence and therefore was not newly-discovered evidence warranting relief from judgment under Civ.R. 60(B)(2).

{¶65} Turning to his fraud-based claims, the trial court found that he had not demonstrated that Wife's conduct "could be construed as fraud, misrepresentation, or other misconduct." It found that Wife was sincere when she testified that she was unaware of her property interests before she received Hadjian's report. The trial court also concluded that Wife's sister's testimony, upon which the trial court "did not rely on in a final judgment[,] cannot constitute fraud, misrepresentation, or other misconduct."

{¶66} Both Husband and Wife appeal the trial court's judgments.

## II. Law and Analysis

### *Husband's appeal*

{¶67} We begin with Husband's appeal, which in seven assignments of error challenges the trial court's rulings excluding evidence, dividing property, awarding spousal support, and denying Husband's Civ.R. 60(B) motion.

A. The trial court properly excluded the ledger

{¶68} In Husband's first assignment of error, he argues that the trial court abused its discretion by suppressing Jafar's ledger, which he claims is proof that his parents repaid his loans. He contends that "when the truth is suppressed by an evidentiary ruling, the ruling is arbitrary, unconscionable, prejudicial, and reversible."

{¶69} A trial court exercises considerable discretion when imposing sanctions for discovery misconduct under Civ.R. 37. *See Lyons v. Kindell*, 2015-Ohio-1709, 35 N.E.3d 7, ¶ 23 (1st Dist.); *see also Nakoff v. Fairview Gen. Hosp.*, 75 Ohio St.3d 254, 256, 662 N.E.2d 1 (1996) ("The discovery rules give the trial court great latitude in crafting sanctions to fit discovery abuses."). We review the imposition of sanctions for an abuse of discretion. *Lyons* at ¶ 24. To constitute an abuse of discretion, the trial court must " 'exercise[e] its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority.' " *In re Y.K.,* 1st Dist. Hamilton No. C-230471, 2024-Ohio-1292, ¶ 9, quoting *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 35. Under this standard of review, "an appellate court must not substitute its judgment for that of the trial court, but must consider the circumstances under which the sanction was imposed and determine whether the sanction was proportionate to the seriousness of the infraction." *Lyons* at ¶ 24.

{¶70} Civ.R. 37(B)(1) allows a trial court confronted with noncompliance with a discovery order to "issue further just orders" that "may include" one of seven sanctions. The sanctions range in severity from staying the proceedings to entering a default judgment against the disobedient party. *See* Civ.R. 37(B)(1)(d)-(f).

{¶71} Under Civ.R. 37(B)(1)(c) the trial court may "prohibit the disobedient party from * * * introducing designated matters into evidence." But excluding "reliable and probative evidence [] is an extreme sanction for a discovery violation." *Di v.*

21

*Cleveland Clinic Found.,* 2016-Ohio-686, 60 N.E.3d 582, ¶ 76 (8th Dist.). While sanctioning misconduct is discretionary, excluding evidence " 'should be invoked only when it is clearly necessary to enforce willful noncompliance or to prevent unfair surprise.' " *Brokamp v. Mercy Hosp.,* 132 Ohio App.3d 850, 860, 726 N.E.2d 594 (1st Dist.1999), quoting *Nickey v. Brown*, 7 Ohio App. 3d 32, 34, 454 N.E.2d 177 (9th Dist.1982). We have explained that,

> [I]n determining whether to impose sanctions and what sanctions are appropriate, "a trial court should consider (1) the history of the case; (2) all the facts and circumstances surrounding the noncompliance; (3) what efforts, if any, the faulting party made to comply; (4) the ability or inability of the faulting party to comply; and (5) any other relevant factors."

*In re Y.K.* at ¶ 13, quoting *Betz v. Penske Truck Leasing Co., L.P.,* 10th Dist. Franklin No. 11AP-982, 2012-Ohio-3472, ¶ 42.

{¶72} Husband's pattern of noncompliant litigation conduct suggests gamesmanship and indicates willful noncompliance with discovery rules and the trial court's orders. His conduct before and during the dispute over the ledger's production compels us to conclude that the trial court acted within its discretion when it suppressed the ledger. And considering the record as a whole, it is apparent that lesser sanctions were ineffective deterrents for Husband's misconduct.

{¶73} With the property trial set for September 17, 2020, Husband received a set of interrogatories and requests for documents on August 6, 2020. After he failed to respond, the trial court rescheduled the trial for October 14, 2020, and imposed a ten-day deadline to respond to Wife's requests. On October 16, 2020, the trial court issued an order to compel Husband's production of documents and complete his

discovery responses by October 30, 2020. Then the trial court rescheduled the property trial for February 2021. On November 5, 2020, the trial court granted Husband's request for an extension and afforded him two additional weeks to complete his response to Wife's August 2020 discovery requests.

{¶74} In early December 2020, the trial court ordered Husband to respond to a separate discovery request by December 16, 2020. It warned him that noncompliance "may result in a finding of contempt and an award of attorney fees."

{¶75} In late December 2020, the trial court held Husband in contempt of its October and December 2020 orders because he "repeatedly failed to comply not with the discovery requests of Mother but with the Court's orders." It found that his conduct was not substantially justified and that a 30-day jail sentence and payment of Wife's attorney fees was necessary to deter Husband from continuing to "hinder this case with impunity." After Husband purged that contempt order, the trial court ordered Husband to complete his discovery responses and admonished the parties to "voluntarily produce documents to the other party and upon a continuing basis." The trial court postponed the property trial until August 2, 2021.

{¶76} Meanwhile, Husband's parents were joined as third-party defendants in February 2021. The discovery requests were served via certified mail in April 2021, and via the sheriff's department in May 2021. But when Wife's parents-in-law failed to respond to those requests by mid-June 2021, she hand delivered them a letter about the requests. Getting no response, she moved to compel their discovery responses and sought sanctions for their failure to respond.

{¶77} Just three weeks before the property trial, Husband responded on Jafar's behalf. He challenged the merits of Wife's request for the equity in Wyndwatch and, without any supporting documentation, claimed that Jafar was "undergoing

23

serious medical issues and treatment." That same day, Husband's attorney delivered Jafar's responses to Wife's discovery requests, which included a one-page document comprised of dates and dollar amounts, with no context.

{¶78} The months-long delay in producing Jafar's ledger is consistent with Husband's discovery misconduct, and his involvement in Jafar's discovery violations warranted a more severe sanction.

{¶79} Husband's primary argument is grounded in the prejudicial effect of excluding Jafar's ledger. He relies on the principle that the evidentiary rules ensure "that the truth may be ascertained and proceedings justly determined." *See* Evid.R. 102. We do not disagree. But other policy considerations are relevant here. Discovery is governed by the Ohio Rules of Civil Procedure, which are designed to "effect just results by eliminating delay, unnecessary expense and all other impediments to the expeditious administration of justice." Civ.R. 1(B). The discovery rules' purpose is to remove surprise by requiring parties to freely exchange information. *Riverside Drive Ents., LLC v. Geotechnology, Inc.,* 2023-Ohio-583, 209 N.E.3d 845, ¶ 12 (1st Dist.), quoting *Jones v. Murphy*, 12 Ohio St.3d 84, 86, 465 N.E.2d 444 (1984).

{¶80} The record shows that Husband impeded the free flow of information and the expeditious administration of justice. The sanction appropriately addressed his misconduct. The trial court did not abuse its discretion by excluding the ledger from the evidence. We overrule Husband's first assignment of error.

B. <u>The court abused its discretion when it divided Wyndwatch</u>

{¶81} Husband's second assignment of error challenges the trial court's classification of equity in Wyndwatch after June 2019 as marital property subject to its equitable division of property. He argues that the trial court abused its discretion when it both calculated the marital portion of the equity based on the use of rental

payments for Wyndwatch's mortgage and awarded Wife half of those rental payments elsewhere in the property division.

{¶82} We review the trial court's property division for an abuse of discretion. *Tyra v. Tyra,* 1st Dist. Hamilton No. C-210392, 2022-Ohio-2504, ¶ 11. But factual issues like " 'the classification and valuation of property[] are reviewed under the distinct sufficiency-and-weight-of-the-evidence standards.' " *Id.*, quoting *Boolchand v. Boolchand*, 1st Dist. Hamilton Nos. C-200111 and C-200120, 2020-Ohio-6951, ¶ 9.

{¶83} Before dividing property in a divorce case, the trial court must "determine what constitutes marital property and what constitutes separate property." R.C. 3105.171(B). Relevant here, marital property is any property acquired during the marriage and owned by either spouse. R.C. 3105.171(A)(3)(a)(i). As part of this determination, the trial court must identify the start and end dates of the marriage. *Owens v. Owens*, 1st Dist. Hamilton No. C-210488, 2022-Ohio-3450, ¶ 18, quoting *Elliot-Thomas v. Lewis*, 9th Dist. Summit No. 29164, 2019-Ohio-3870, ¶ 5. These dates are " ' "critical in distinguishing marital, separate, and post-separation assets and determining appropriate dates for valuation." ' " *Owens* at ¶ 19, quoting *Kachmar v. Kachmar*, 7th Dist. Mahoning No. 08 MA 90, 2010-Ohio-1311, ¶ 47, quoting *Angles v. Angles*, 5th Dist. No. 00CA1, 2000 Ohio App. LEXIS 4281, 12 (Sept. 15, 2000).

{¶84} Marriages typically terminate on the date of the final divorce hearing. *Id*. at ¶ 20, quoting *Harris v. Harris*, 11th Dist. Ashtabula No. 2002-A-81, 2003-Ohio-5350, ¶ 10; s*ee* R.C. 3105.171(A)(2). But a trial court may select a de facto marriage termination date when "the parties separate, make no attempt at reconciliation, continually maintain separate residences, separate business activities and/or separate bank accounts." *Id.,* quoting *Harris* at ¶ 11. When calculating the properties' value, courts "should consistently apply the same set of dates." *Id*. at ¶ 19. But a trial court

may select different valuation dates if the court sufficiently explains its reasoning and it does not abuse its discretion. *Id.*; *see* R.C. 3105.171(G).

**{¶85}** After classifying and valuing property, the trial court must equitably divide the property under R.C. 3105.171. *Id.* at ¶ 11, citing R.C. 3105.171(B). Generally, courts should award spouses their separate property and equally divide all marital property, unless dividing the marital property equally would be inequitable. *See id.*; *see also Boolchand,* 1st Dist. Hamilton Nos. C-200111 and C-200120, 2020-Ohio-6951, at ¶ 5, citing R.C. 3105.171(B)-(D). When an equal division is inequitable, the court must determine what constitutes an equitable division. *Id.*; R.C. 3105.171(C)(1). When dividing marital property, the court must consider R.C. 3105.171(F)'s nonexhaustive list of factors.

**{¶86}** The trial court classified Wyndwatch's equity as marital and valued it at $241,906 because the property was worth $500,000 and had a remaining mortgage balance of $258,904.[3] The trial court cited evidence that the Michelle's Oak rent payments were used to pay Wyndwatch's mortgage and awarded Wife half of the equity in the property.

**{¶87}** The trial court identified June 17, 2019, as the de facto marriage termination date. According to the stipulated amortization table, the balance of Wyndwatch's mortgage was $268,235.48 on July 1, 2019. The mortgage balance cited by the trial court does not correspond to its de facto termination date. Rather, the $258,904 mortgage balance corresponds to December 1, 2020, according to the amortization table.

---

[3] Although $500,000 - $258,904 = $241,096, Husband does not challenge this valuation.

{¶88} The February, April, June, July, September, October, and November 2020 Michelle's Oak rent payments were applied to Wyndwatch's mortgage in May, July, and September through November 2020. And in addition to half of Wyndwatch's equity, the trial court awarded Wife $11,500, half of the rent payments collected by Husband from June 1, 2019, through November 30, 2020. In other words, the trial court appeared to have awarded Wife both half of the rental income and half of Wyndwatch's equity, which it found was funded in part by that rental income.

{¶89} The trial court abused its discretion when it failed to explain why it relied on the Michelle's Oak rent payments to choose a December 2020 valuation date for Wyndwatch's equity while also crediting Wife with half of those rent payments. Therefore, we sustain Husband's second assignment of error, reverse the property division as it relates to Wyndwatch, and remand the case for additional findings or to recalculate the division of Wyndwatch's equity.

C. The trial court's $72,115 valuation of the loan to Husband's parents was not against the manifest weight of the evidence

{¶90} In his third assignment of error, Husband argues that the trial court abused its discretion when it determined that Husband's parents owe the parties $72,115. He claims that the evidence shows that his father repaid the loans.

{¶91} While Husband argues that this issue should be reviewed for an abuse of discretion, he is challenging the value of the loan, which is a question of fact that we review under a manifest-weight standard. *See Tyra,* 1st Dist. Hamilton No. C-210392, 2022-Ohio-2504, at ¶ 11. For questions of fact, " ' "we must give deference to the trial court's findings, and the court's decision on the matter will not be reversed as against the manifest weight of the evidence when it is supported by competent credible evidence." ' " *Id.* at ¶ 15, quoting *Fiamengo v. Fiamengo*, 2d Dist. Montgomery No.

27

26704, 2016-Ohio-4720, ¶ 28, quoting *Maloney v. Maloney*, 160 Ohio App.3d 209, 2005-Ohio-1368, 826 N.E.2d 864, ¶ 22 (2d Dist.).

{¶92} The trial court found that Husband loaned his father money using marital funds and that the outstanding balance was $72,115. Husband disagrees with that value, citing his testimony that his father repaid the loan and that he used the repayment to pay for the roughly $300,000 worth of renovations of the marital residence. He also cites his testimony that his father is well respected and capable of repaying those loans. And Husband insists that Wife's testimony and evidence confirmed that Husband's father could bring money into the United States and stored cash in the safe in the marital residence. In the end, he argues that the trial court should have believed his testimony over Wife's.

{¶93} But the trial court made credibility findings when it determined the loan's value. Beginning with the Wyndwatch mortgage payments, it explained that Husband failed to provide "documented proof of these repayments, but asserts that his father always paid him the correct amount." Turning to Husband's claim that he paid a contractor in cash, the trial court noted that Husband failed to provide receipts or an agreement with the contractor. It found that Husband's "testimony about the repayments is not credible and is contrary to the weight of the evidence."

{¶94} It is well established that "the determination of witnesses' credibility and the resolution of conflicts in the evidence are matters for the trier of facts." *Kinnett v. Corporate Document Solutions, Inc.,* 1st Dist. Hamilton No. C-180189, 2019-Ohio-2025, ¶ 21. The Supreme Court of Ohio has explained that, when reviewing the weight of the evidence, appellate courts must "be guided by a presumption that the findings of the trier-of-fact were indeed correct." *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 79-80, 461 N.E.2d 1273 (1984).

{¶95} The trial court was in the best position to judge witness credibility. It found Husband's claim that his parents repaid the loan lacking in credibility, and we defer to the trial court on this matter. And Wife's testimony about the outstanding balance of the loan is supported by Husband's ledger. Because competent and credible evidence supports the trial court's $72,115 valuation of the loan's balance, it was not against the manifest weight of the evidence. We overrule the third assignment of error.

D. The trial court reasonably selected an alternative valuation date for the parties' retirement accounts

{¶96} In his fourth assignment of error, Husband claims that the trial court abused its discretion when it awarded Wife the marital portion of his retirement account up to December 31, 2020, rather than the de facto marriage termination date.

{¶97} The trial "court has broad discretion in determining [valuation] dates, and its decision will not be reversed absent an abuse of that discretion." *Berger v. Berger*, 1st Dist. Hamilton No. C-030631, 2004-Ohio-5614, ¶ 12. To establish an abuse of discretion, Husband must show that the trial "court's attitude is 'unreasonable, arbitrary or unconscionable' and does not exhibit a sound reasoning process." *Id.* at ¶ 11, quoting *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). As an exercise of its discretion, the "court may use alternate valuation dates to achieve the equitable distribution of marital assets." *Id.* at ¶ 12.

{¶98} The trial court identified June 17, 2019, as the de facto marriage termination date. But it found that equity required dividing their retirement accounts up to December 31, 2020, because Husband "did not pay the ordered temporary support to [Wife] between the filing date and December 31, 2020." Husband points out that the trial court ordered him to pay his support arrearage and argues the trial court compensated Wife for Husband's unpaid support twice.

{¶99} In addition to ordering temporary child and spousal support, the magistrate ordered Husband to pay two-thirds of the children's education expenses. At trial, the parties testified that Husband failed to pay those expenses. Rather, that financial burden fell on Wife. At the same time, Wife was responsible for the majority share of parenting time. Against this backdrop, Wife testified that she was unable to contribute anything meaningful to her retirement. It was not unreasonable for the trial court to conclude, based on Husband's noncompliance with the magistrate's temporary order, that equity required employing an alternate valuation date for dividing the parties' retirement accounts.

{¶100} Thus, the trial court did not abuse its discretion by selecting December 31, 2020, as the valuation date for dividing the parties' retirement accounts. We overrule Husband's fourth assignment of error.

E. <u>The trial court reasonably relied on the parties' jointly-recommended expert to value Husband's business</u>

{¶101} In his fifth assignment of error, Husband argues that the trial court abused its discretion when it valued his business at $1,115,000. First, he argues that the trial court impermissibly "double dipped" when it valued his business and calculated his spousal-support obligation based on the same assets. Second, he maintains that the trial court should have relied on the price that he paid for the businesses to determine his practice's value. Third, he argues that the court should have permitted him to sell the practice. We address his arguments out of order.

{¶102} We review the trial court's valuation of property under a manifest-weight standard. *See Tyra*, 1st Dist. Hamilton No. C-210392, 2022-Ohio-2504, at ¶ 11. We " 'weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence, the trial court

clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.' " *McKenna v. McKenna*, 1st Dist. Hamilton No. C-180475, 2019-Ohio-3807, ¶ 10, quoting *In re A.B.,* 1st Dist. Hamilton No. C-150307, 2015-Ohio-3247, ¶ 14.

{**¶103**} The trial court found that Husband's practice was worth $1,115,000 for purposes of its property-division and spousal-support order. It based that valuation on Lutocka's June 2019 valuation, which it considered "accurate and reliable." Moreover, it cited the parties' joint selection and retention of Lutocka to value their businesses as an additional reason to rely on her assessments.

{**¶104**} Husband points out that he purchased one half of his practice from his former business partner for $160,000 in 2017, and the other half from Dr. Pies for $60,000 in 2019. He argues these transactions demonstrate his practice's value.

{**¶105**} But it is well established that the trial court is not required "to adopt any particular method of valuation or division of marital property." *Stapleton v. Stapleton*, 1st Dist. Hamilton No. C-210329, 2022-Ohio-3018, ¶ 30. Ohio courts have rejected rigid rules for determining the value of property, " 'as equity depends on the totality of the circumstances.' " *Dollries v. Dollries*, 12th Dist. Butler Nos. CA2012-08-167 and CA2012-11-234, 2014-Ohio-1883, ¶ 10, quoting *Baker v. Baker*, 83 Ohio App.3d 700, 702, 615 N.E.2d 699 (9th Dist.1992). And " ' "when the parties present substantially different valuations of an asset," [the trial court] may believe all, part, or none of any witness's testimony.' " *Lotz v. Lotz,* 3d Dist. Auglaize No. 2-14-06, 2014-Ohio-5625, ¶ 18, quoting *Huelskamp v. Huelskamp*, 185 Ohio App.3d 611, 2009-Ohio-6864, 925 N.E.2d 167, ¶ 27 (3d Dist.), quoting *Covert v. Covert*, 4th Dist. Adams No. 03CA778, 2004-Ohio-3534, ¶ 29.

{¶106} Lutocka, a certified business valuation and financial forensics expert with experience valuing medical and dental practices, thoroughly explained her valuation methodology. She considered Husband's purchases in her expert report and testimony, along with transactional sales data of "guideline companies" and "similar transactions" as part of her market-based approach to valuing the company. While Husband testified that the practice is worth, at most, $250,000, the trial court " 'is not required to adopt the valuation of any witness, but is instead vested with wide discretion to determine the weight of the evidence and the credibility of witnesses.' " *Anderson v. Anderson*, 147 Ohio App.3d 513, 2002-Ohio-1156, 771 N.E.2d 303, ¶ 74 (7th Dist.), quoting *Murray & Co. Marina, Inc. v. Erie Cty. Bd. of Revision*, 123 Ohio App.3d 166, 172, 703 N.E.2d 846 (1997). The trial court did not err because it found Lutocka's valuation credible, and Husband's not credible.

{¶107} Husband also argues that the trial court should have granted his request to sell his medical practice and associated real estate. But his motion explained to the court, without any detail, that he "has received offer(s) to purchase his practice as well as the real estate property associated with the practice." At trial, Husband testified that the group offering to buy his business consisted of his friend and other professional acquaintances. We find no merit to his argument that the trial court erred when it failed to order the sale of his practice.

{¶108} Finally, Husband argues that the trial court's valuation should be reduced because both the valuation and the spousal-support order relied on the same assets, which constitutes an abuse of discretion because it resulted in a "double dip" of his income.

{¶109} Trial courts enjoy broad discretion when considering spousal support, and we will not reverse a spousal-support award absent an abuse of discretion. *See*

*Morrison v. Walters*, 1st Dist. Hamilton No. C-210398, 2022-Ohio-1740, ¶ 3, quoting *Reese v. Reese*, 2019-Ohio-2810, 139 N.E.3d 1288 ¶ 11 (1st Dist.).

{¶110} After issuing its property division, the trial court "may award reasonable spousal support to either party." R.C. 3105.18(B). The trial court must consider several factors, including "the income of the parties" and the "relative assets and liabilities of the parties." R.C. 3105.18(C)(1)(a) and (i).

{¶111} Based on expert testimony that the trial court found "credible and competent," the trial court found that Husband's income was $926,470 for support purposes. That calculation incorporated its property-division findings, including valuation of the parties' assets and liabilities. Thus, it considered Lutocka's valuation of Husband's practice when it ordered spousal support.

{¶112} Husband contends that this was improper because Lutocka's valuations were based on his practice's cash on hand, which included his salary that typically was not paid until the following year. He asserts that because the court considered his income in both its property-division and spousal-support awards, the trial court double counted his income, or "double dipped." But this argument ignores the distinction between the market-based and asset-based approaches employed by Lutocka, and the income-based approach that Lutocka found not relevant.

{¶113} "Double dipping" is "double counting of a marital asset, once in the property division and again in the spousal support award." *McCarty v. McCarty,* 12th Dist. Warren Nos. CA2016-07-055 and CA2016-07-056, 2017-Ohio-5852, ¶ 34. Specifically, " 'a double dip occurs when a court twice counts *a future income stream—once in valuing the marital asset and once in*" awarding spousal support. (Emphasis in original.) *Settele v. Settele*, 2015-Ohio-3746, 42 N.E.3d 243, ¶ 27 (10th Dist.), quoting *Gallo v. Gallo,* 10th Dist. Franklin No. 14AP-179, 2015-Ohio-982, ¶ 18. The

future income stream, rather than the marital asset, "is the subject of the doubling in the double dip.' " *Id.* at ¶ 27, quoting *Gallo* at ¶ 18. Double dipping occurs only with "specific reliance on a future income stream." *Gallo* at ¶ 18.

{¶114} In *Settele,* the Tenth District explained that "the 'hallmark necessary for the danger of double dipping to arise' is a business valuation derived from its future income stream, [and] generally no double dip occurs if the business is valued through a market-based or asset-based approach." *Id.*, quoting *Gallo* at ¶ 26; *see Bohme v. Bohme*, 2d Dist. Montgomery No. 26021, 2015-Ohio-339, ¶ 28 ("Surely, if the business value were arrived at by using one of the other two methods of valuation—the market approach * * * or the asset approach—no one reasonably would assert that Richard's income was counted twice."). And in *Bohme* the Second District reasoned that double dipping "is not as easily applied for suggesting that income from a closely-held business, particularly a wholly-owned professional practice, is counted twice when that income is considered as a tool to value the business and then as actual income for a spousal-support calculation." *Bohme* at ¶ 25.

{¶115} In contrast, relying on an income-based approach to value a spouse's business treats that spouse's expected earnings as both income and asset for spousal-support purposes. *See Heller v. Heller*, 10th Dist. Franklin No. 07AP-871, 2008-Ohio-3296, ¶ 23. This approach generally constitutes an abuse of discretion. *Id.*

{¶116} Lutocka explained that the income-based approach is "predicated on the present value of future earnings, reflecting risk and opportunity in a required rate of return." In contrast, the asset- and market-based approaches do not look at future earnings. Lutocka explained that not every method is relevant when valuing a business, which was why she only considered, rather than relied upon, the income approach. Lutocka did not factor an income-approach based valuation into her final

valuation of Husband's practice—she only used asset- and market-based approaches to determine his practice's value. And because Lutocka did not consider Husband's future income when determining the practice's value, neither did the trial court.

**{¶117}** The trial court's valuation of Husband's practice was not an abuse of discretion. We overrule Husband's fifth assignment of error.

F. <u>The trial court did not abuse its discretion when it awarded Wife spousal support</u>

**{¶118}** Husband claims in his sixth assignment of error that the trial court abused its discretion when it awarded Wife $12,500 in monthly spousal support for six years. He maintains that the trial court attempted to equalize the assets and did not consider Wife's separate Iranian property. He also argues that the trial court failed to consider his health issues, which allegedly limited his ability to work.

**{¶119}** When deciding whether a spousal-support award is "appropriate and reasonable, and in determining the nature, amount, and terms of payment, and duration of spousal support," the court must consider a variety of statutory factors, including: 1.) the parties' income from all sources, including the divided property; 2.) the parties' relative earning abilities; 3.) the parties' ages and health; 4.) the parties' retirement benefits; 5.) the duration of the marriage; 6.) the parties' standard of living during the marriage; 7.) the parties' relative education; 8.) the parties' relative assets and liabilities, including court-ordered payments; 9.) each party's contribution to the other's education, training, or earning ability; 10.) the tax consequences resulting from a spousal-support award; 11.) a party's lost income capacity resulting from marital responsibilities; and 12.) any other relevant and equitable factor. R.C. 3105.18(C)(1).

**{¶120}** The trial court "is not required to enumerate each statutory factor as long as it considered the relevant factors." *Reddy v. Reddy*, 1st Dist. Hamilton Nos. C-

140609 and C-140678, 2015-Ohio-3368, ¶ 23. Requiring trial courts to consider all relevant factors avoids reducing spousal support to a "mathematical formula." *Kaechele v. Kaechele*, 35 Ohio St.3d 93, 518 N.E.2d 1197 (1988), paragraph one of the syllabus. The goal of any spousal-support order "is to reach an equitable result." *Hloska v. Hloska*, 8th Dist. Cuyahoga No. 101690, 2015-Ohio-2153, ¶ 11. Appellate courts uphold spousal-support awards if the trial court considered the statutory factors and the judgment permits the reviewing court to determine whether the award is fair, equitable, and lawful. *See Williams v. Grayson*, 8th Dist. Cuyahoga No. 112575, 2024-Ohio-247, ¶ 6.

{¶121} Here, the trial court's detailed decision addresses the parties' income, earning abilities, health, retirement benefits, standard of living, education, assets and liabilities, contributions to the other parties' earning abilities, and lost income due to marital responsibilities. While the trial court found that an award of $12,500 per month for six years was "reasonable and appropriate," it clarified that this "amount is not meant to make the parties equal." Instead, it was ordered "to provide Wife and the children with the same standard of living they enjoyed during the marriage." This amount afforded Wife time to "build up her dental practice to a point where it can provide a comfortable lifestyle, similar to the one she enjoyed while being married."

{¶122} Husband maintains that the trial court failed to consider Wife's assets in Iran. But the trial court expressly addressed that property and refused to consider it for any purpose because Wife's interest was a contingent interest and, "[a]t best, any possibility that the property will actually be available to [Wife], and what value it might be if it becomes available, is purely speculative." Specifically, Wife had "no right to either property at this time, and her mother may partially or totally dispose of the property at any time."

{¶123} Moreover, the only evidence of the property's value was a report that valued her property at $3,000,000, without any supporting evidence. Wife's expert testified about the report's deficiencies. And the trial court cited the "complete lack of basis for any determination as to the fair market value of the properties" in its order.

{¶124} Husband also argues that the trial court failed to consider his "substantial health issues" that he asserts impede his ability to work and generate income. The trial court acknowledged that he experienced dizziness, lightheaded spells, and shortness of breath, but testing could not identify the cause of these issues. It also noted that the trial had been postponed for months to accommodate his health concerns, yet he "was able to travel three times," including an international vacation to Colombia. The trial court stated that Husband's "claims that he is unable to work are not credible and appear to be put forth for the purpose of reducing his income with the goal of reducing his support obligations."

{¶125} It is axiomatic that " 'each party has the burden of producing evidence as to any of the R.C. 3105.18(C)(1) factors it wants considered, and must provide facts tending to prove its version of the manner in which such factors should be applied.' " *Walters*, 1st Dist. Hamilton No. C-210398, 2022-Ohio-1740, at ¶ 8, quoting *Hunley v. Hunley*, 12th Dist. Clermont No. CA2019-12-101, 2020-Ohio-5053, ¶ 27. The trial court considered Husband's evidence, but found that his testimony and exhibits were not credible. Trial courts are in the best position to assess witness credibility. *Risch v. Samuel,* 1st Dist. Hamilton No. C-190159, 2020-Ohio-1094, ¶ 21.

{¶126} In sum, the trial court did not abuse its broad discretion when it awarded Wife spousal support. We overrule Husband's sixth assignment of error.

G. The trial court reasonably denied Husband's Civ.R. 60(B) motion

{¶127} In his final assignment of error, Husband contends that the trial court abused its discretion when it denied his Civ.R. 60(B) motion for relief from judgment. He argues he established that Wife committed a fraud on the court by claiming that she was unaware of her interest in property in Iran and believed any interest was conditional, and that he "uncovered Wife's deception" when her sister testified in a deposition after trial.

{¶128} Under Civ.R. 60(B)(3), a party may obtain relief from a judgment based on "fraud * * *, misrepresentation, or other misconduct of an adverse party." The moving party must establish the adverse party's fraud by clear and convincing evidence. *Kell v. Verderber,* 1st Dist. Hamilton No. C-120665, 2013-Ohio-4223, ¶ 44. We review the trial court's decision to deny a Civ.R. 60(B) motion for an abuse of discretion. *Id.* at ¶ 37.

{¶129} To establish a claim of fraud under Civ.R. 60(B)(3), the moving party must show that the "adverse party's fraud, misrepresentation, or misconduct * * * prevented the other party from fully and fairly presenting its case." *Luke v. Roubanes,* 2018-Ohio-1065, 109 N.E.3d 671, ¶ 23 (10th Dist.). Husband was required to prove that Wife made "(1) a representation, which; (2) is material to the transaction at hand; (3) made falsely, with knowledge of its falsity; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance upon the representation; and (6) a resulting injury proximately caused by the reliance." *Barton v. Barton,* 2d Dist. Greene No. 2015-CA-53, 2016-Ohio-5264, ¶ 18.

{¶130} The trial court found that Husband "failed to demonstrate that any conduct by [Wife] that [sic] could be construed as fraud." It "strongly disagree[d]" with Husband's claim that her failure to disclose her family's property interests was

38

intentional, and found her testimony at trial that she was unaware of the property "to be sincere." The trial court explained that while her sister's deposition testimony stated that the properties belonged to the children, her sister "clarified her previous statement" and explained "in her limited understanding, the property in Iran may be under the children's name, but it is not controlled by them" and "believes her mother has full control over the property."

{¶131} The decision indicates that the trial court found Wife's sister's explanation credible. And even if this court were to disbelieve Wife's sister's testimony, " 'a reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court.' " *State v. Rasool*, 1st Dist. Hamilton Nos. C-210615 and C-210616, 2022-Ohio-3409, ¶ 14, quoting *Seasons Coal Co.*, 10 Ohio St.3d at 81, 461 N.E.2d 1273.

{¶132} The trial court acted within its discretion when it denied Husband's motion for relief from judgment. We overrule his seventh assignment of error.

### *Wife's cross-appeal*

{¶133} In her sole assignment of error, Wife argues that the trial court abused its discretion when it denied her request for attorney fees under R.C. 3105.73. She claims that an attorney-fee award was warranted because of Husband's litigation misconduct, which forced her to incur extraordinary fees.

{¶134} Under R.C. 3107.73(A), "a court may award all or part of reasonable attorney's fees and litigation expenses to either party if the court finds the award equitable." To make that determination, the trial court can consider any factor it finds equitable, including the parties' income and assets, and any spousal-support orders. R.C. 3107.73(A). We review the trial court's decision for an abuse of discretion. *Walters*, 1st Dist. Hamilton Nos. C-220643 and C-220644, 2023-Ohio-2887, at ¶ 12.

{¶135} The trial court denied Wife's request for attorney fees, recognizing that she "incurred $338,825.00 of attorney fees, expert fees, and expenses during the pendency of the trial." And it agreed that Husband's conduct contributed to her legal bills. Nevertheless, it reasoned that attorney fees were improper because the "parties have an abundance of marital assets and income" and the preservation of Husband's temporary-support arrearage.

{¶136} The litigation in this case was contentious, to say the least. While Husband consistently disregarded the trial court's orders, the trial court found him in contempt of court and awarded Wife $5,673 in attorney fees in December 2020, and $1,204 in April 2021 for that disregard. The trial court's property division resulted in Wife receiving $486,760.50. The trial court awarded Wife "$12,500.00 per month for a period of six (6) years" in spousal support and preserved his arrearage. It found him in contempt of the temporary-support order and ordered him to pay the $224,437.71 spousal-support arrearage, and the $13,930.54 child-support arrearage. It was not unreasonable for the trial court to conclude that an additional award of attorney fees would be inequitable based on the property division, the award of future spousal support, and the order for Husband to pay his unpaid child and spousal support.

{¶137} Wife argues that a party's contemptuous behavior in defiance of court orders is routinely cited as the basis for awarding attorney fees. She argues that Husband's conduct is similar to, if not worse than, the husband's conduct in *Roush v. Roush*, 2017-Ohio-840, 85 N.E.3d 1268 (10th Dist.). In *Roush,* an attorney-fee award was upheld based on the wealth disparity between the parties and husband's multiple violations of court orders. *Id.* at ¶ 35. While noncompliance with court orders is a reasonable justification for awarding attorney fees, that case considered whether the trial court's decision *to award* attorney fees constituted an abuse of its discretion.

40

Here, this court must determine whether the trial court's decision to *deny* her request for attorney fees constitutes an abuse of discretion.

{¶138} Similarly, the cases that Wife cites in support of her arguments that Husband obstructed the discovery process and unnecessarily prolonged the case involved appellate courts upholding attorney-fee awards. *See Kane v. Hardin*, 1st Dist. Hamilton No. C-180525, 2019-Ohio-4362, ¶ 32 ("the decision to award attorney fees to Kane was not unreasonable or arbitrary"); *see also Long v. Long*, 10th Dist. Franklin No. 11AP-510, 2012-Ohio-6254, ¶ 18 ("the award of attorney fees was equitable pursuant to R.C. 3105.73(B)"); *Cwik v. Cwik*, 1st Dist. Hamilton No. C-090843, 2011-Ohio-463, ¶ 104 ("we conclude that the trial court's award of $15,000 in attorney fees to Soman was not an abuse of discretion"); *Hussain v. Hussain*, 2020-Ohio-531, 152 N.E.3d 365, ¶ 46 (12th Dist.) ("we find that the trial court did not abuse its discretion in ordering Husband to pay Wife $13,636.59 in attorney fees"); *Williams v. Williams*, 2018-Ohio-611, 106 N.E.3d 317, ¶ 29 (2d Dist.) ("We cannot say, based upon this record, that the trial court abused its discretion regarding the award of attorney fees").

{¶139} But even if an appellate court holds a different opinion about whether a trial court should have granted attorney's fees, "an appellate court may not substitute its judgment for that of the trial court." *Walton v. Walton*, 3d Dist. Union No. 14-10-21, 2011-Ohio-2847, ¶ 39. The trial court considered the relevant factors, including the parties' income and support obligations, and reasonably concluded that an attorney-fee award was improper. Therefore, the trial court did not abuse its discretion when it denied Wife's request. We overrule Wife's sole assignment of error.

### III. <u>Conclusion</u>

{¶140} We sustain Husband's second assignment of error, reverse the trial court's valuation and division of Wyndwatch's equity, and remand the case to the trial court to recalculate the equity or make further findings. We overrule Husband's six other assignments of error and Wife's sole assignment of error.

Judgment accordingly.

**ZAYAS** and **WINKLER, JJ.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.